STATE of Wisconsin, Plaintiff-Respondent,†

v.

James Richard COLEMAN, Defendant-Appellant.

Court of Appeals

*N0. 2014AP867–CR. Submitted on briefs November 4, 2014.
—Decided April 14, 2015.*

2015 WI App 38

(Also reported in 865 N.W.2d 190.)

† Petition for Review denied August 5, 2015.

447

APPEAL from a judgment and an order of the circuit court for Milwaukee County: DENNIS R. CIMPL and STEPHANIE ROTHSTEIN, Judges. *Reversed and cause remanded for a new trial.*

On behalf of the defendant-appellant, the cause was submitted on the briefs of *John A. Pray* of *The University of Wisconsin Law School, Frank J. Remington Center*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general and *Gabe Johnson-Karp*, assistant attorney general.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. KESSLER, J. James Richard Coleman appeals a judgment of conviction, following a jury trial, of two counts of second-degree sexual assault of a child under the age of sixteen, contrary to WIS. STAT. § 948.02(2) (2013–14).[1] Coleman also appeals the order denying his postconviction motion. Because we agree that Coleman's defense counsel performed deficiently, and that the deficiencies prejudiced Coleman, we reverse and remand for a new trial.[2]

## BACKGROUND

¶ 2. The following facts are taken from the complaint and from trial testimony. On October 4, 2011, Coleman was charged with two counts of second-

---

[1] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

[2] The Honorable Dennis R. Cimpl presided over the trial. The Honorable Stephanie Rothstein presided over the *Machner* hearing and denied Coleman's motion for postconviction relief. *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

degree sexual assault of a child for the alleged assault of C.B., the thirteen-year-old daughter of Coleman's cousin, Floyd Miller. According to the complaint, Coleman was temporarily living with Miller, Miller's wife, Sara Bergman, and C.B. The complaint states that on the morning of September 21, 2011, after C.B.'s father and stepmother left for work, Coleman came into C.B.'s room, where he was storing his clothes. Rather than go to the closet, however, the complaint states that Coleman went to C.B.'s bed, got on top of C.B., and began moving his body on top of hers. The complaint also states that Coleman got under the covers with C.B., who was lying on her stomach, and began grinding his pelvis against her buttocks. C.B. told police that she could feel Coleman's bare penis.

¶ 3. The complaint also alleges that on the morning of September 22, 2011, Coleman again got into bed with C.B. C.B. pretended to be asleep while Coleman licked C.B.'s vaginal area. The case was tried to a jury.

## The Trial.

¶ 4. During *voir dire,* Coleman's defense counsel informed the jury that Coleman "has been convicted of a crime before."

¶ 5. Later, during his opening statement, Coleman's defense counsel elaborated by telling the jury that Coleman spent time in prison:

> Mr. Coleman by the way is a person *that spent time in prison.* Mr. Coleman is a man, 57 years old, that *[has] done all kind[s] of things in his past. So he's not an angel here,* but what we are trying to talk about here is what happened in the month of September, the day specifically of the 21st, and 22nd, 2011.

(Emphasis added.) Counsel continued his opening statement with an unambiguous representation that Coleman would testify:

> We're going to show you through our cross examination, *Mr. Coleman will testify because he has to testify here from my point of view. It's my call to make as a defense attorney. We're going to testify* and show through cross examination that the facts are not as [the prosecutor] said and weaved this third grade story, telling this story.

(Emphasis added.)

¶ 6. The representation was not true; Coleman did not testify. In his closing argument, Coleman's defense counsel did not take responsibility for Coleman not testifying, nor did he explain to the jury why the promise he made in his opening statement was not fulfilled.

¶ 7. The State's main witness was C.B., who was thirteen years old in 2011. She testified that in the summer of 2011, she moved in with her father and his wife, Bergman. C.B. stated that at that time Coleman was living there as well. C.B. told the jury that Coleman became her "best friend," because he was "somebody I could always tell something to." Specifically, C.B. stated that she confided in Coleman about her friendships, arguments with her stepmother, and her relationship with her ex-boyfriend.

¶ 8. C.B. testified that Coleman slept in the living room of the apartment, but that his belongings were stored in the closet in C.B.'s bedroom. C.B. explained that her bed was positioned against the closet door. C.B. told the jury that on the morning of September 21, 2011, Coleman came into her room and moved her bed so that he could reach his closet. She

stated that Coleman "act[ed] like he was grabbing his clothes from a hanger," but that his body was "moving against" her and that his "private" was "making the fabric of his pants poke out." C.B. pretended to sleep, but told the jury she could feel Coleman's "private" between her upper thighs.

¶ 9. C.B. stated that the following morning Coleman again entered her room and again got on top of her to access the closet. She said that she pretended to sleep while Coleman got into bed with her, attempted to insert his penis in her vagina, and also licked her vagina. C.B. said that Coleman then checked his phone and said, "I got to go." Coleman then left the room. C.B. said once Coleman left the room, she locked herself in her father's bedroom and slipped a note outside the bedroom door to Coleman saying: "I am telling my daddy that you had raped me and if you say anything to me or touch me you will be reported to the cops." C.B. stated that Coleman attempted to talk to her, but she refused to say anything to him. C.B. left for school after Coleman left for work, but she did not report either incident to anyone at school that day.

¶ 10. C.B. further testified that she told her father about the incidents when she returned from school on September 22, 2011.

¶ 11. C.B.'s father, Miller, told the jury that he was driving home from work on September 22, 2011, when he saw C.B. on the sidewalk outside of the apartment. When Miller drove to C.B. and asked her what was wrong, C.B. "broke down and started crying, said [Coleman] raped her." Miller said that he took C.B. inside their apartment, told her to stay in his (Miller's) bedroom, and then told Coleman that he (Miller) was going to pack up all of Coleman's things and kick Coleman out of the apartment.

¶ 12. After Coleman left the apartment, Miller spoke with C.B., but stated that C.B. could not articulate what Coleman allegedly did to her. Miller said that he contemplated calling the police, but decided against it because he was unsure of whether C.B. was telling the truth. He also decided against taking C.B. to the hospital.

¶ 13. Bergman told the jury that she was not comfortable with the closeness between Coleman and C.B. Bergman testified that on the evening of September 22, 2011, she received a text message from C.B. saying something to the effect of "[Coleman] had molested her and that her dad was taking him home." Bergman stated that she was unsure of whether to believe C.B.'s message because "she's had problems with lying." Upon returning home, Bergman spoke with C.B. about C.B.'s accusations. Bergman said that C.B. "gave . . . some details, to me she didn't make a lot of sense when she was telling me but I was more—she could tell I wasn't sure if I believed her or not." Bergman testified that she was hesitant to call the police because C.B. had been "untruthful" in the past.

¶ 14. Jennifer Handlen, the social worker at C.B.'s school, told the jury that on September 23, 2011, C.B. told her that Coleman had sexually assaulted her (C.B.). Handlen contacted the local police department.

¶ 15. Detective Ann Golombowski testified that she interviewed C.B. at C.B.'s school, and then C.B. was taken to the Child Protection Center where she was examined by a pediatric nurse. According to Golombowski's police report, C.B. told three people that Coleman ejaculated on her leg. C.B. told an officer that "she felt something sticky on her thigh." C.B. told Bergman, her stepmother, that "Coleman rubbed his penis against [C.B.'s vagina] until he came on her leg."

C.B. told her school counselor, Handlen, that "she could feel his thing on her body and felt a wet sticky substance on the back of her right thigh." Golombowski stated that after interviewing C.B., she went to C.B.'s home and collected the clothing C.B. wore at the time of the alleged assaults, along with C.B.'s unwashed sheets and blankets from the time of the alleged assaults, for testing. No male DNA was found on any of the items, nor was any male DNA found on C.B.

¶ 16. The jury found Coleman guilty on both counts.

**The Postconviction Motion.**

¶ 17. Postconviction, Coleman moved for a new trial alleging, as relevant to this appeal, that defense counsel was ineffective for: (1) telling the jury before the trial that Coleman had been convicted of a crime and spent time in jail; (2) telling the jury that Coleman would testify, but then failing to call Coleman to testify; (3) failing to present evidence that C.B. told three people that Coleman ejaculated during the second assault (which would have made the fact that no male DNA was found on C.B.'s clothing or bedding more probative of C.B.'s credibility); and (4) failing to present other evidence inconsistent with C.B.'s trial testimony—namely, that after the first assault Miller noticed that C.B. watched television with Coleman until 8:15 p.m., although C.B. claimed she went to bed at 6:00 p.m. to avoid Coleman.

¶ 18. The circuit court conducted a *Machner* hearing. Defense counsel testified about each of Coleman's allegations. We discuss that testimony in connection with the discussion of the specific issues in this

appeal. The circuit court concluded all of defense counsel's decisions were strategic and reasonable, and denied Coleman's postconviction motion.

## DISCUSSION

¶ 19. On appeal, Coleman raises the same issues brought in his postconviction motion. We conclude that Coleman's defense counsel performed deficiently as to each of the claims and that the cumulative effect of the deficiencies prejudiced Coleman.

### Standard of Review.

¶ 20. Wisconsin has long recognized that in a criminal case "[t]he right to counsel is more than the right to nominal representation. Representation must be effective." *State v. Felton*, 110 Wis. 2d 485, 499, 329 N.W.2d 161 (1983). " 'Ineffectiveness is neither a judgment of the motives or abilities of lawyers nor an inquiry into culpability. The concern is simply whether the adversary system has functioned properly.' " *Id.* (citation omitted). In *Felton*, our supreme court reversed a murder conviction and remanded for a new trial because the combination of so many errors by defense counsel prejudiced the defense. *Id.* at 519. Simply calling a lawyer's decision "trial strategy" is not sufficient to defeat a claim of ineffective assistance. *Id.* at 502–03. Rather, "[t]rial counsel's decisions must be based upon facts and law upon which an ordinarily prudent lawyer would have then relied." *Id.* at 503. "We must consider the law and the facts as they existed when trial counsel's conduct occurred." *Id.* at 502–03. To prevail on a claim of ineffective assistance

of counsel, a criminal defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, a defendant must establish that his or her counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The defendant must overcome a strong presumption that his or her counsel acted reasonably within professional norms. *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990).

▮▮▮

¶ 21. To show prejudice, the defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* When a defendant alleges multiple deficiencies by trial counsel, prejudice should be assessed based on the cumulative effect of these deficiencies. *State v. Thiel*, 2003 WI 111, ¶ 59, 264 Wis. 2d 571, 665 N.W.2d 305.

▮▮▮

¶ 22. "Ineffective assistance of counsel claims present mixed questions of law and fact." *State v. Zimmerman*, 2003 WI App 196, ¶ 35, 266 Wis. 2d 1003, 669 N.W.2d 762. "A trial court's factual findings must be upheld unless they are clearly erroneous. Whether counsel's performance was deficient and, if so, whether the deficient performance prejudiced the defendant present questions of law, which we review

de novo." *Id.* (internal citation omitted). "The defendant has the burden of persuasion on both prongs of the test." *Id.*

¶ 23. In *State v. Krancki,* 2014 WI App 80, 355 Wis. 2d 503, 851 N.W.2d 824, we discussed ineffective assistance of defense counsel based on a promise to the jury in the opening statement that a defendant would testify, which later did not occur, and which counsel did not explain to the jury. Prior to trial, Krancki insisted to his counsel that he wanted to testify that another person was driving the vehicle involved in the crime charged. *Id.*, ¶ 3. Counsel's opening statement was based on that insistence. *Id.* Although counsel was skeptical of the testimony his client wanted to present, "counsel was ethically bound to Krancki's decision to testify as that was Krancki's constitutional right, and counsel's . . . statement . . . was a direct result of a decision dictated by Krancki." *Id.*, ¶ 11. We concluded that " '[i]f a defendant selects a course of action, that defendant will not be heard later to allege error or defects precipitated by such action.' " *Id.* (citation omitted).

**Deficient Performance.**

**A. Counsel's disclosure that Coleman had a prior conviction, had spent time in prison and was "not an angel."**

¶ 24. During *voir dire,* defense counsel told the jury that Coleman "has been convicted of a crime before." At the *Machner* hearing, counsel explained that he made this disclosure

> [t]o sort of take the thunder away from the state. It's going to come out at some point, some way or another,

and I wanted to get it out there first . . . . I didn't want the jury to hear it for the first time from the state that my client had been convicted of a crime. I didn't want them to hear for the first time from the state that my client had been to prison.

¶ 25. Defense counsel testified that he thought Coleman's prior conviction would be revealed to the jury at some point. Based on the charges in this case, Coleman's prior record could come before the jury only if Coleman testified. *See State v. Kuntz*, 160 Wis. 2d 722, 752, 467 N.W.2d 531 (1991) (Evidence of prior convictions is admissible for impeachment purposes, but even then the information available to the jury about the convictions is limited and the trial court is to take multiple factors into consideration because of the prejudicial effect of such information.).[3]

¶ 26. Defense counsel also claimed that telling the jury about Coleman's prior conviction during *voir dire* would help to weed out potential jurors who may

---

[3] The Dissent argues that these disclosures were "reasonable . . . to present Coleman as a person with nothing to hide." *See* Dissent, ¶ 8. We might agree such disclosure was reasonable if such evidence was admissible because it was an element of a crime charged (which it is not here). We might agree such a disclosure was reasonable if the defendant's credibility was a matter for the jury because counsel had a reasonable factual basis to believe defendant intended to testify. *See State v. Krancki*, 2014 WI App 80, ¶ 11, 355 Wis. 2d 503, 851 N.W.2d 824. Here, counsel's own testimony at the *Machner* hearing confirms that he had no facts upon which to base a good faith belief that Coleman *would* testify. Had the information "slipped out" from a State's witness, a mistrial or a curative instruction could have dealt with the ensuing prejudice to the defendant. Here, by contrast, the prejudice from the unnecessary disclosure of not merely a prior conviction, but the strong suggestion of other unsavory conduct ("not an angel"), was effectively a poke in the eye from Coleman's own counsel.

463

have preconceived notions about convicts. Counsel did not explain how his disclosure would "weed out" potential bias, nor did he identify any information actually obtained that helped him conclude whether the potential jurors felt favorably or adversely toward Coleman. There is no evidence of any follow-up questions counsel asked, nor is there evidence of any actual use counsel made of these prejudicial disclosures that helped his client in any way. Consequently, we are unable to discern a reasonable strategic basis for this disclosure.[4]

██ ██

¶ 27. Without an unambiguous commitment from Coleman that he *would* testify, defense counsel's disclosure of a prior conviction for the purpose of enhancing Coleman's credibility before Coleman took the stand, was not a reasonable strategic decision. Defense counsel's performance in that respect was deficient. A defendant's credibility becomes a jury issue *only* if the defendant testifies. By sharing information about Coleman's prison time, as well as by demeaning his client's character with comments about Coleman doing "all kind[s] of things in his past" and not being "an angel," defense counsel told the jury things that, if disclosed by the State at that time or later, would likely have resulted in a mistrial. *See Mulkovich v. State*, 73

---

[4] The Dissent acknowledges that defense counsel "thought it unlikely that Coleman would testify later in the trial," but states that the possibility that Coleman would have been subject to impeachment if he testified made counsel's decision reasonable. *See* Dissent, ¶ 12. It is clear from counsel's *Machner* testimony that, unlike counsel in *Krancki*, counsel here did not have a good faith basis to believe that Coleman would testify. Counsel's "strategic" claim is no more than an assertion with no factual basis, which qualifies as neither reasonable nor strategic.

Wis. 2d 464, 473, 243 N.W.2d 198 (1976) (unnecessarily informing a jury of a defendant's prior convictions can constitute prejudicial error, mandating either a mistrial or reversal). Defense counsel's claim that the disclosure was strategic does not insulate review of the reasonableness of that strategy. *See Felton*, 110 Wis. 2d at 502 (reviewing court does not ratify a lawyer's decision simply because it is labeled "trial strategy" by trial court). "Trial counsel's decisions must be based upon facts and law upon which an ordinarily prudent lawyer would have then relied." *Id.* at 503. This standard "implies deliberateness, caution, and circumspection" and the decision "must evince reasonableness under the circumstances." *Id.* at 502. Consequently, we are unable to discern a reasonable strategic basis for this disclosure.

## B. The opening statement promise that Coleman would testify.

¶ 28. Defense counsel testified at the *Machner* hearing that Coleman "never wanted to testify . . . never said I'm going to testify." Counsel agreed that Coleman "never said he was going to testify or that he intended to."[5] The circuit court found defense counsel credible. At the time of *voir dire,* there was no evidence

---

[5] Coleman also testified at the *Machner* hearing. Coleman testified he had "wanted to testify from the beginning" and told his attorney that. The Dissent appears to rely on Coleman's statements at the *Machner* hearing to conclude that counsel's opening statement promise of Coleman's testimony was reasonable strategy. *See* Dissent, ¶ 5. Such reliance is inappropriate. The postconviction court concluded Coleman was not credible, and explained why. The circuit court is the ultimate arbiter of the credibility of witnesses. *State v. Ayala*, 2011 WI

that Coleman ever unambiguously told his lawyer that he wanted to waive his Fifth Amendment rights and testify. To the contrary, counsel testified that he knew at the time of the *voir dire* that Coleman did *not* want to testify. Consequently, we are unable to discern a reasonable strategic basis for this disclosure.

¶ 29. As we have seen, in his opening statement, defense counsel told the jury: "Mr. Coleman will testify because he has to testify here from my point of view. It's my call to make as a defense attorney." At the *Machner* hearing, defense counsel admitted that whether Coleman testified was not his "call to make" and said that the statement "was just a misstatement. I mean you can't take that literally." Counsel said:

> You don't want to start the jury off by saying "My guy's not going to testify" or something like that. *I wanted to try to give Mr. Coleman some sort of credibility* in the face of these horrendous allegations. So we start off by saying: Oh, we're gonna testify. It's his right to testify and we've got something to say. *But that was just a statement for the jury.*

(Emphasis added.) Counsel characterized his unambiguous representation to the jury that Coleman would testify as a "strategic" decision to give Coleman "some sort of credibility" with the jury. Because Coleman's credibility would not have been before the jury unless he first testified, it is difficult to discern any legal or factual support for that statement at the time counsel made it. How this damaging disclosure could give either Coleman or his defense "some sort of credibility"

---

App 6, ¶ 10, 331 Wis. 2d 171, 793 N.W.2d 511 (WI App 2010). We cannot properly rely on statements of disputed fact made by a witness the circuit court has found not to be credible.

suggests counsel's belief that Coleman and his defense lacked credibility before the trial had even commenced. Such a view ignores the presumption of innocence, and the State's burden of proof. *See* WIS JI—CRIMINAL 140.

¶ 30. More problematic, however, is defense counsel's justification for the clearly unfounded statement: "But that was *just a statement for the jury.*" (Emphasis added.) The comment suggests counsel was not concerned with accuracy. Defense counsel is seen by the jury as an agent for the defendant. If counsel says something will happen that does not, without explanation, counsel necessarily damages both his own, and potentially his client's, credibility. Such a cavalier regard for being truthful with the jury is not how "an ordinarily prudent lawyer" in Wisconsin would represent a client. *See Felton*, 110 Wis. 2d at 503.

■■

¶ 31. When questioned about whether, during his opening statement, defense counsel knew whether it was reasonably probable that Coleman *would* testify, counsel responded:

> I did not know that. The only time ... when the decision was made that he wasn't going to testify was at the time when the Court asked him was he gonna testify. That's when the decision [was made]. Not way up there [during opening statements].

As to defense counsel's statement that defense attorneys decide whether their clients testify, counsel acknowledged at the *Machner* hearing that the right to testify was Coleman's alone. It is a defendant's constitutional right to testify, and that right can be waived or exercised *only* by the defendant. *See State v. Albright*, 96 Wis. 2d 122, 128, 291 N.W.2d 487 (1980). Counsel

unambiguously and knowingly misstated the law to the jury. We cannot discern how counsel reasonably believed he was helping Coleman's credibility by knowingly misstating the law and counsel's authority to the jury. At best, counsel seriously damaged his own credibility with the jury when he made an unambiguous representation which he had no basis for believing he could keep, and which he did not fulfill.

¶ 32. The Dissent asserts that we conclude "that counsel is ineffective unless he or she knows *for sure* that the client will testify." *See* Dissent, ¶ 7. That is not the case—our decision is limited to the facts before us. The facts in the record are: counsel testified that at the time of *voir dire* and the opening statement counsel knew Coleman did *not* want to testify; counsel said that Coleman never told counsel he wanted to testify; Coleman did not testify; and counsel did not explain to the jury why Coleman did not testify. Unlike in *Krancki*, the record does not establish that Coleman unambiguously asserted his wish to testify; nor does the record establish that before the beginning of trial, Coleman led his lawyer to reasonably believe that he would testify.

## C. Impeachment evidence.

██

¶ 33. Coleman argues defense counsel was ineffective for failing to impeach C.B.'s credibility in two specific ways. First, counsel failed to question three specific witnesses about C.B.'s statements that Coleman ejaculated on her leg during the second assault. Had the jury known about her ejaculation claim, Coleman argues, it would have undermined C.B.'s credibility because the State found no male DNA on C.B., her clothing, or her bedding, making C.B.'s

468

version of the assault improbable. Second, counsel failed to question Miller about his statement to police that C.B. watched television with Coleman until 8:00 p.m. on the night of the first assault, though C.B. stated that she went to bed at 6:15 p.m. to avoid Coleman.

¶ 34. C.B.'s clothes worn on the days of both assaults, her unwashed bed sheets, underwear, and blanket,[6] plus swabs taken from multiple parts of C.B.'s body, showed no evidence of male DNA. Counsel did not question officer Golombowski, Bergman or Handlen, all of whom had reported that C.B. said Coleman ejaculated on her leg.

¶ 35. Defense counsel's explanation for his failure to cross-examine these witnesses, to whom C.B. had described the "wet and sticky substance," was:

> [T]he state had no DNA to substantiate any allegations of that sort. I see no reason to open the door on it for one thing. No. 2, I didn't want to talk about any sticky, wet substance on a 13–year old girl before a jury that's already heard it. It was his word against hers.[7]

This explanation is not reasonable given counsel's role as Coleman's defense counsel. Surely, discussing se-

---

[6] Detective Golombowski retrieved these items from C.B.'s room the day after the second alleged assault.

[7] Counsel's description of the case as "his word against hers" at the *Machner* hearing is inconsistent with the facts counsel knew at the time of the trial—there was no evidence that Coleman ever unambiguously indicated to counsel that he was going to testify, and counsel knew that Coleman did not want to testify. Coleman never brought "his word" to the jury. In his closing argument, Coleman's counsel made no reference to Coleman's "word," nor did counsel offer any explanation for why Coleman did not testify.

men on a thirteen-year-old girl is no one's preferred activity. Nonetheless, it is that thirteen-year-old girl's statements to third parties that made such a discussion relevant and material in this case. The discussion was relevant and material precisely because of the lack of male DNA in places where it would normally be expected to be found (i.e., on the unwashed bedding and clothing) if C.B.'s report of the second assault was accurate. Counsel's decision not to pursue this evidence, apparently because he believed it was distasteful to the jury, was not a reasonable strategic decision given the facts in this record. Counsel's performance in this aspect was deficient.

¶ 36. Second, C.B. told the jury that on the evening of September 21, 2011, the day of the first assault, she came home from school and then went to bed at 6:00 p.m. in order to avoid Coleman. However, a police report contains a statement from her father that he saw C.B. sitting with Coleman watching television until past 8:00 p.m. that evening.

¶ 37. To explain his failure to produce C.B.'s father's statement, which contradicts C.B.'s testimony, counsel stated:

> It's such a minor detail to me . . . . We can beat every little inconsistency all we want to. But my point of view as defense attorney at that time, some of these things just would have drawn out something that I wanted to get away from.
>
> 

¶ 38. What "things" would have been "drawn out" that counsel "wanted to get away from" are not discernable from the record. The whole subject of child sexual assault by a trusted adult is undoubtedly a subject that most people would like "to get away from." But that is impossible in a case specifically about the

allegations of such an assault. Even distasteful facts favorable to the defense should be discussed, in a professional manner, if effective assistance of counsel is to be provided.

¶ 39. We agree that this detail, standing alone, might be minor. However, defense counsel called no witnesses and relied completely on his cross-examination of the State's witnesses, which made C.B.'s credibility the cornerstone of this case. It is difficult to understand why counsel failed to raise this easily understood inconsistency observed by C.B.'s father. If this were counsel's only misstep in the trial, it might, as a "minor detail," not rise to deficient performance. But it was not the only misstep. We cannot ignore the combination of deficiencies in performance by counsel discussed above. The errors were not based on *reasonable* strategic decisions. They constitute deficient performance.

Prejudice.

¶ 40. The cumulative effect of defense counsel's deficiencies undermines our confidence in the reliability of the proceedings. The cumulative result of the failures caused improper information to go before the jury and kept the jury from hearing other important evidence that would have impeached C.B.'s testimony. The cumulative effect was prejudicial to Coleman's defense.

¶ 41. "[W]hen a court finds numerous deficiencies in a counsel's performance, it need not rely on the prejudicial effect of a single deficiency if, taken together, the deficiencies establish cumulative prejudice." *Thiel*, 264 Wis. 2d 571, ¶ 59. "In order to dem-

onstrate that counsel's deficient performance is constitutionally prejudicial, the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.*, ¶ 20 (citation omitted). "The focus of this inquiry is not on the outcome of the trial, but on 'the reliability of the proceedings.' " *Id.* (citation omitted). "[I]n determining whether a defendant has been prejudiced as a result of counsel's deficient performance, we may aggregate the effects of multiple incidents of deficient performance in determining whether the overall impact of the deficiencies satisfied the standard for a new trial under *Strickland*." *Thiel*, 264 Wis. 2d 571, ¶ 60. We do not assess counsel's overall performance, but rather whether Coleman received a fair and reliable trial. *See i d.*, ¶ 62. "Just as a single mistake in an attorney's otherwise commendable representation may be so serious as to impugn the integrity of a proceeding, the cumulative effect of several deficient acts or omissions may, in certain instances, also undermine a reviewing court's confidence in the outcome of a proceeding." *Id.*, ¶ 60.

¶ 42. Defense counsel's *voir dire* comment that Coleman spent time in prison, and the opening statement comment that Coleman was "not an angel," and had done "all kind[s] of things in his past," gave the jury negative and prejudicial information that was not relevant to any element of the crime. Generally, juries are allowed to hear only that prior convictions exist and the number of offenses when the defendant decides to testify because of the presumption that the number of convictions speaks to the credibility of the witness. *See State v. Midell*, 39 Wis. 2d 733, 738–39,

159 N.W.2d 614 (1968). Telling the jury a defendant previously committed a crime is so prejudicial that it is generally inadmissible evidence. *See Kuntz*, 160 Wis. 2d at 752. It is common knowledge that one does not spend time in prison without having been convicted of a significant crime. When counsel disclosed this damaging information, there was no evidence that Coleman unambiguously intended to testify. The "strategic" reasons offered by counsel for disclosure of this highly prejudicial material were not reasonable under the circumstances here because there were no facts from which counsel could reasonably have concluded that Coleman's prior conviction would properly be disclosed to the jury.[8]

¶ 43. Counsel damaged his client's position again in the opening statement for no reasons that we can consider reasonable strategy. Not only did counsel unambiguously assure the jury that Coleman *would* testify, but he told the jury that "he [has] to testify" and that "It's my call to make [as] a defense attorney." Counsel was wrong on the law and the facts. *See State v. Nelson*, 2014 WI 70, ¶ 24, 355 Wis. 2d 722, 849 N.W.2d 317 (ultimate decision about whether to testify belongs to the defendant); *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983) (defendant has the right to make final decisions on whether to exercise key constitutional rights, such as the right to testify). A strategy based on an erroneous view of the law is deficient performance as a matter of law. *See Thiel*, 264 Wis. 2d 571, ¶ 51. Nor did counsel blunt the impact of his

---

[8] Indeed, if Coleman had elected to testify, counsel would then have a reasonable strategic reason to disclose—*through Coleman's testimony*—the fact of conviction and the number of convictions.

unfulfilled promise in his closing argument when he did not offer an explanation for why Coleman did not testify.

¶ 44. C.B.'s father and stepmother both told the jury that they were unsure of whether to believe C.B.'s claims of assault. Had the jury been aware that C.B. told three different witnesses that Coleman ejaculated on her, the lack of male DNA on her clothing or bedding would have taken on heightened significance because concrete evidence (semen) was not found where a reasonable person would expect it to be. Because counsel did not address the ejaculation reports, the jury had no reason to understand the real significance of the lack of male DNA in relation to C.B.'s credibility.

¶ 45. Counsel also failed to present impeachment evidence from C.B.'s father who reported that he saw her watching TV with Coleman, on the evening of the second assault, about two hours after C.B. testified she went to bed to avoid seeing Coleman. This failure, standing alone, does not prejudice Coleman.

¶ 46. However, the cumulative effect of counsel's multiple deficiencies undermines our confidence in Coleman's conviction. There was no physical evidence of an assault. There were no witnesses to the assault. The entire case depended on whether the jury found C.B. credible. The combination of counsel's errors bolstered C.B.'s credibility by failing to present significant impeaching evidence. The combination of counsel's other errors impugned Coleman's character before the jury by providing inadmissible information that could easily have resulted in a mistrial had it come from the State. Coleman was prejudiced on both fronts.

## CONCLUSION

¶ 47. We conclude that there is a reasonable probability that the results of the proceeding would have been different but for trial counsel's deficient performance. Accordingly, we reverse and remand for a new trial.

*By the Court.*—Judgment and order reversed and cause remanded for a new trial.

¶ 48. BRENNAN, J. (*dissenting*). I dissent from the Majority opinion because I believe it fails to be "highly deferential" to trial counsel's strategic decisions, disregards the "strong presumption" that counsel's representation "falls within the wide range of reasonable professional assistance" and engages in the "distorting effects of hindsight." *See Strickland v. Washington*, 466 U.S. 668, 689 (1984); *see also State v. Carter*, 2010 WI 40, ¶ 22, 324 Wis. 2d 640, 782 N.W.2d 695.

¶ 49. Our job is to review the reasonableness of trial counsel's strategic choices from counsel's perspective *at the time* of counsel's conduct. *State v. Felton*, 110 Wis. 2d 485, 502–03, 329 N.W.2d 161 (1983). The standard we apply is an *objective* standard of *reasonably* effective assistance. *Strickland*, 466 U.S. at 687–88. And, as our Wisconsin Supreme Court has noted, the objective standard does not require that counsel's performance be perfect to be constitutionally adequate. *State v. Thiel*, 2003 WI 111, ¶ 19, 264 Wis. 2d 571, 665 N.W.2d 305.

¶ 50. Applying the proper standard of review here, I would affirm because trial counsel's defense strategies were reasonable at the time they were made and fall within the wide range of reasonable professional assistance.

*. Trial counsel's strategic reasons for stating that Coleman would testify were not unreasonable.*

¶ 51. The Majority concludes that trial counsel's strategy of attempting to enhance Coleman's credibility by saying in his opening statement that Coleman *would* testify constitutes deficient representation because counsel did not know *for sure* that Coleman would testify.

¶ 52. First, it is important to note that Coleman is *not* contending that he told trial counsel at the time of the opening statement that he would *not* testify. In fact, Coleman *admits* in his appellate brief that "he was always under the impression that he *would* testify [o]n his own behalf, thus making Atty. Taylor's opening statement consistent with that plan." (Emphasis added.) Coleman even testified at the *Machner* hearing that, at the time trial counsel made his opening statement, Coleman intended to testify and that he had told trial counsel that he intended to testify.

¶ 53. And it is true that trial counsel was not *sure* whether Coleman would testify. Trial counsel testified at the *Machner* hearing that he thought Coleman did not want to testify, but that he might yet decide to testify. Counsel also stated that he knew that the final decision was Coleman's and would not be made until the defense case:

> That decision was not made until the final moment even though he had some apprehension about testifying from the beginning. And throughout that, still that decision was his. He could have said at any time: I'm going to testify and that would have been it.

Trial counsel correctly assessed the law. No trial counsel knows for sure at opening statement if the defen-

dant is going to testify later in the trial. That decision is the defendant's alone and is not made until much later.

¶ 54. Thus, the Majority's conclusion that counsel is ineffective unless he or she knows *for sure* that the client will testify is, first of all, impractical and legally impossible to know. Clients can, and do, change their minds and the law explicitly says they can do so up to the point of testifying. And secondly, such a rule contravenes the standard of review for ineffective-assistance claims. *Strickland* clearly states that we are to review the strategic reasons for counsel's conduct. *Id.*, 466 U.S. at 691. We are to do so from counsel's perspective at the time of the conduct and apply the objective standard of reasonably effective, not perfect, assistance. *See Felton*, 110 Wis. 2d at 502–03; *see also Thiel*, 264 Wis. 2d 571, ¶ 19.

¶ 55. When we apply the proper standard of review to trial counsel's stated strategic decisions here, we see that trial counsel had strategic reasons for wanting to tell the jury in opening what his client's testimony would be. He was to present the "I've got nothing to hide" credibility enhancement strategy. Trial counsel testified that he was trying to give Coleman "some sort of credibility in the face of these horrendous allegations." Coleman was facing a child victim who was going to testify to his predatory sexual acts. It was a he-said, she-said case. It was certainly reasonable for trial counsel to want to present Coleman as a person with nothing to hide to enhance his credibility in the jury's eyes.

¶ 56. Additionally, as the postconviction court noted, this strategy was actually a rather artful way of presenting Coleman's testimony without calling him and subjecting him to cross-examination or impeach-

ment. There was no down-side to the strategy because, if Coleman chose not to testify, the State would be prohibited from commenting on his silence and the jury would be instructed that it was Coleman's right not to testify.

¶ 57. Thus, I conclude that, from the perspective of trial counsel during opening statement, this was an objectively reasonable strategy that falls within a wide range of reasonably professional assistance.

2. *Trial counsel's strategic reasons for telling the jury of Coleman's prior conviction, prison time and that he was "not an angel" were not unreasonable.*

¶ 58. As the Majority notes, trial counsel told the jury during *voir dire* that Coleman had a prior criminal conviction. Counsel testified at the *Machner* hearing that he did so "to take the thunder away from the state" and to remove any jurors who might have been biased against someone convicted of a crime. The Majority finds this to be an unreasonable *voir dire* strategy because counsel was not *sure* that Coleman would testify and the Majority concludes that there is no way the prior record would come in unless Coleman did testify.

¶ 59. While trial counsel may have thought it unlikely that Coleman would testify later in the trial, it was certainly possible, and under Wisconsin law, had Coleman taken the stand, he would have been subjected to impeachment by his prior criminal conviction. *See State v. Kuntz*, 160 Wis. 2d 722, 753, 467 N.W.2d 531 (1991) (A prior conviction on any crime is relevant to the credibility of a witness's testimony.); *see also Liphford v. State*, 43 Wis. 2d 367, 371, 168 N.W.2d 549 (1969) (Our law presumes that a person who has been

convicted of a crime is less likely to be a truthful witness than a person who has not been convicted.). Therefore, trial counsel's decision to inform the jury panel of Coleman's prior conviction so that he could attempt to remove any jurors who would have been biased as a result of that conviction was certainly reasonable and a common defense trial tactic.

¶ 60. Next, the Majority finds deficient trial counsel's opening statement that Coleman served time in prison and was "not an angel." It is true that his prison sentence would ordinarily not have been allowed to be mentioned at trial even if Coleman testified and was subject to impeachment by his prior conviction. However, at the time trial counsel was making his opening statement, there was reason for trial counsel to believe from the police reports that the testimony might reveal or suggest that Coleman had been recently released from incarceration.

¶ 61. The testimony could have revealed that Coleman was sleeping on the couch in the victim's parents' apartment because he had nowhere to stay after his recent release from prison. Even if trial counsel could have brought a motion to exclude reference to Coleman's prison experience, the jury would be told, at a minimum, if Coleman testified, that Coleman had previously been convicted of a crime and had no place to live so he was sleeping on the victim's family's couch. From this, it was reasonable for trial counsel to be concerned that a juror might surmise that Coleman had been to prison.

¶ 62. In that context, it was not totally unreasonable for trial counsel to want to be the one to tell the jury of Coleman's past so that trial counsel could "clothe it in some sort of way that wouldn't be so harsh towards [Coleman]," as trial counsel testified at

the *Machner* hearing. Telling the jury that Coleman was "not an angel," accomplished the same reasonable strategy of "tak[ing] the thunder away from the state."

¶ 63. But even assuming that mention of his prison sentence and the "not an angel" comment were deficient, they cannot be considered prejudicial. This was a credibility case. The case was always going to boil down to who the jury believed—the child victim or Coleman. Trial counsel presented a reasonable "fabrication" defense. The jury knew that the child's parents did not believe her and that the Crime Lab evidence did not support part of her testimony. In that context, Coleman's past would have had little impact on his credibility in the jury's eyes. Admitting that Coleman was not perfect may have even enhanced his credibility.

¶ 64. Additionally, any prejudice was cured by the jury instructions. The trial court gave the jury the standard instructions, informing the jury: that statements and arguments of counsel were not evidence; of the weight to be given to counsels' arguments; of the State's burden of proof; and that the defendant's decision not to testify must not influence the verdict. Wisconsin law presumes that a verdict was based on the evidence presented and the instructions provided by the court. *See State v. Chambers*, 173 Wis. 2d 237, 259, 496 N.W.2d 191 (Ct. App. 1992).

¶ 65. Under the circumstances, trial counsel's strategy of attempting to take the thunder away from the State was not objectively unreasonable or prejudicial.

3. *Trial counsel's failure to impeach the victim with her "sticky wet stuff" statement to police was not deficient representation.*

¶ 66. At trial, the thirteen-year-old victim testified to one act of sexual contact on September 21, 2011, that is, she testified that Coleman was moving his body against hers and that his "private" was "making the fabric of his pants poke out." She described the second act that occurred on September 22, 2011, where Coleman attempted to insert his penis into her vagina and licked her vaginal area. She reported the assault to her parents that day and to a school social worker the following day. The school notified police, and the victim's clothes, unwashed sheets and blankets were collected and analyzed at the Crime Lab. However, no male DNA evidence was found on any item or on the victim. The jury was told all of this information.

¶ 67. The Majority concludes it was deficient to fail to impeach the child victim with the statement she made to the detective that she told her stepmom, the school social worker and the detective that when Coleman ejaculated "she could feel his thing on her body and felt a wet sticky substance on the back of her right thigh."

¶ 68. Trial counsel testified that he did not think he needed the additional impeachment testimony because he had the Crime Lab evidence that no male DNA was found. He was also concerned that had he cross-examined the victim on the stand about the "wet sticky substance" statement to the detective, it would have highlighted a more reprehensible sexual assault than the victim testified to. The postconviction court agreed and noted that it is a common sexual assault defense strategy to stay away from any impeachment

that makes it look like the lawyer is picking on the victim, particularly a child victim, especially where the lawyer does not need to. I agree.

¶ 69. Trial counsel reasonably concluded that the risks of this impeachment outweighed its potential benefit—especially given the Crime Lab evidence already available. This was a reasonable defense strategy and was neither deficient nor prejudicial.

4. *Trial counsel's failure to impeach the victim with her inconsistent statement about how long she watched TV with Coleman the day after the assault was neither deficient nor prejudicial.*

¶ 70. Even the Majority agrees that failing to impeach the child victim with her inconsistency about whether she went to bed at 6:00 p.m. or 8:00 p.m. the day after the assault and how long she watched TV with Coleman is not deficient representation. However, the Majority lumps this claim in with the others to conclude the cumulative deficiencies were prejudicial and warrant reversal. If it is not a deficiency—as the Majority concedes—then it does not warrant being included in the cumulative prejudice analysis because that analysis only applies to "deficiencies." *See Thiel*, 264 Wis. 2d 571, ¶ 59 (When a defendant alleges multiple deficiencies by trial counsel, prejudice should be assessed based on the cumulative effect of *those deficiencies.*).

## CONCLUSION

¶ 71. The law presumes trial counsel was reasonably competent and warns reviewing courts not to engage in second-guessing or hindsight. *Strickland*,

466 U.S. at 689. There is a prescribed standard of review that is important to adhere to. Applying that law here, trial counsel was not deficient in any of the claimed respects. I would affirm.