COURT OF APPEALS
DECISION
DATED AND FILED

June 8, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1715-CR**

Cir. Ct. No. 2013CF210

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

LAMONT DONNELL SHOLAR,

DEFENDANT-APPELLANT.

APPEAL from a judgment and orders of the circuit court for Milwaukee County: JONATHAN D. WATTS, MICHELLE ACKERMAN HAVAS, and T. CHRISTOPHER DEE, Judges. *Affirmed*.

Before Dugan, White and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Lamont Donnell Sholar appeals from two orders denying his motions for postconviction relief and his judgment of conviction for one count of armed robbery by use of force as a party to a crime, contrary to WIS. STAT. §§ 943.32(1)(a) and (2), 939.50(3)(c), 939.05 (2019-20),[1] and one count of burglary "while unarmed, but armed himself with a dangerous weapon while in the burglarized enclosure," contrary to WIS. STAT. §§ 943.10(2)(b), 939.50(3)(e), 939.05.  Sholar argues that under *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the police searched his cell site location information (CSLI) in violation of the Fourth Amendment because the police obtained the data by subpoena and not a warrant.  Additionally, Sholar argues that the prosecutor engaged in misconduct regarding his co-actor's plea agreement, that his co-actor's reduced prison sentence constitutes newly discovered evidence, and that trial counsel provided ineffective assistance of counsel.  We reject all arguments and affirm.

## BACKGROUND

¶2    The State filed a criminal complaint that alleged that Sholar and co-defendant Mario James committed an armed robbery and burglary on October 27, 2010.[2]  On that date, Village of Greendale Police Department officers were dispatched to an apartment where the resident, J.W., provided a statement that two

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] The criminal complaint was filed in January 2013.  Sholar, James, and Anthony Santiago originally had been charged in November 2010.  In September 2011, the Honorable Charles F. Kahn, Jr. granted Sholar's motion to suppress his statements to police and the State's motion to dismiss the charges against Sholar without prejudice.  After Santiago entered a guilty plea in April 2012, he was debriefed by the Milwaukee Police Department in June 2012.  Santiago agreed to testify against Sholar and James and the State proceeded on the instant complaint.

men—a black man that the State later alleged was James and a white or Hispanic man, whom Anthony Santiago later admitted was him—forced their way into his apartment with a gun, forced J.W. into the kitchen, and threw him to the ground. J.W. had his hands tied behind his back with zip ties and duct tape was put over his mouth and around his ankles. Santiago rummaged around the apartment asking where he kept the guns and money. According to J.W., Santiago spoke with a third individual by telephone, whom Santiago later alleged was Sholar, and then the men left the apartment with J.W.'s belongings. J.W. was able to free himself and called police. J.W. reported stolen in the robbery: a .380 caliber handgun, a nine-millimeter handgun, a bolt-action rifle, a 12-gauge shotgun, an AR-15 rifle with attached grenade launcher, a "holster, flare, utility knife, … range bag with ammunition, clips," gaming equipment, a money clip, $200-$300 in cash, two bank cards in his name, and J.W.'s Wisconsin photo ID.

¶3    Later on October 27, 2010, City of Milwaukee Police Department officers went to Santiago's residence to investigate reports of firearms being stored and sold there. Santiago was at the residence when the police arrived and the officers confirmed his identity by paperwork in his name which was found in a bedroom. The police recovered six firearms from the residence, including one that matched the AR-15 rifle stolen from J.W.'s apartment earlier that day. The police also recovered a firearm bag containing ammunition and firearm accessories that matched the description of the bag stolen from J.W.'s apartment, as well as J.W.'s Wisconsin photo ID, two bank cards in his name, and a black holster.

¶4    In August 2013, Sholar filed a motion to suppress all evidence discovered in the search of his residence on October 28, 2010, including but not

limited to his cell phone.[3]  The trial court[4] denied the motion, concluding that "the police [had] probable cause to believe the defendant was involved in a crime" and that the court found no problem with the police "entry, the arrest, the seizure of the cell phone, or any of the issues that are connected with the defendant's motion."

¶5      The case proceeded to a jury trial in October 2013.  Here, we recite the testimony relevant to this appeal.  The State called J.W., who identified Sholar in the courtroom.  J.W. and Sholar had been employed at a Domino's Pizza location at the same time.  J.W. testified to the events of the robbery.  Santiago knocked on his door three times.  The first time Santiago claimed he was looking for someone; the second time J.W. noticed that Santiago was wearing purple latex gloves, which prompted J.W. to retrieve one of his firearms.  J.W. testified that the third time Santiago knocked, he opened the door, another man[5] carrying a handgun pushed his way in and pushed him into the kitchen.  J.W. "fell backward" and the man with the gun was "standing above" him, pointing the gun at him.  The men yelled at him to turn over, and despite trying to keep his firearm inside his hoodie, the "guy with the purple latex gloves pulled [his] arms from underneath [him] and the gun came out."  Then, one of the men zip-tied his hands behind his back and the other duct taped his legs together, forcing him to look down at the floor while on his stomach.  Before his mouth was duct taped shut, the men asked where his

---

[3] Also, in August 2013, Sholar filed a motion, *pro se*, to dismiss the action for constitutional violations and violations of the prompt disposition statute.  Because this motion is not relevant to his appeal, we do not address it.

[4] The Honorable Jonathan D. Watts presided over Sholar's trial and sentencing; we refer to him as the trial court.  Judge Watts also presided over Santiago's sentencing.

[5] J.W. did not identify James in the courtroom; however, the State alleged James was the second man.  J.W. testified that he described the second man with the silver handgun as a "short man," who was "wearing leather gloves" and a "black jacket."

money was. He overheard one of the men make a phone call and say, "Come get us or — something like that." He heard them search the apartment and then gathering things before they pushed him out of the way and left.

¶6      The State called Santiago, who testified that he told his friend, James, that he was risking eviction and needed $300 quickly. James and Sholar picked up Santiago and the three of them discussed a plan in which they would rob someone. Santiago's role was to try to get into the house because Sholar knew the proposed victim as "he used to work with him, and his brother currently worked with him." Santiago did not know much about J.W. other than he worked at a pizza place and one of the defendants "in the car was saying how the victim was showing pictures at work of the guns he bought." The three men drove to a Burger King on the north side of Milwaukee, where Sholar's brother gave him a small .22 caliber handgun, and then Sholar drove the three of them to the robbery location. Santiago then noticed a folder in the back seat of the car; he thought that people answer doors for process servers and he "could use the folder to look … a little more professional, get somebody to open the door up."

¶7      Santiago testified that he approached the J.W.'s apartment multiple times. The first time, he left the car alone and "scope[d] it" by walking by and glancing through the window of the house to see if anyone was moving around inside. The second time, he and James went to the door of the apartment; James was armed with the .22 caliber handgun and out of sight of the doorway. Santiago knocked, J.W. opened the door with the chain lock, and Santiago asked for someone named "Adam." J.W. said he was alone and there was no one named Adam there. Santiago and James walked away and walked around for a bit.

¶8      Santiago testified that the third time Santiago and James returned to the apartment, he was still carrying the folder, some latex gloves from the car, and zip ties, while James had the handgun.  Santiago "knocked on the door again. [J.W.] didn't open the door.  He just talked through the door."  Santiago claimed he had a picture of the person he was looking for, and wanted to show it to him. J.W. opened the door, James went in, grabbed him by the shirt, put the gun in his face, walked him back and put him on the floor in the kitchen.  Santiago and James zip-tied J.W.'s hands and duct taped his mouth.  When they put him on the floor, the gun that J.W. was holding fell on the floor; Santiago kicked it away and they took the gun with them in the robbery.

¶9      Santiago testified that after J.W. was securely positioned face-down on the floor so he could not see what was going on, Santiago called Sholar on his cell phone.  He opened the kitchen door to allow Sholar to enter.  Santiago stayed in the kitchen watching J.W. while the other men searched the apartment.  Sholar and James removed guns, gun cases, and gun accessories from the apartment and then all three of them left.

¶10     Santiago testified that the three of them drove back to Santiago's residence.  They parked the car in the alley, then they "decided to chill for a little bit."  Then they "went upstairs, chilled for a second, not too long, then went down and started bringing things upstairs."  They "grab[bed] everything, took it upstairs to see what was there."  Santiago recalled that these guns were taken in the robbery:  an "AR-15 with a grenade launcher, a 30.06, a single bolt-action rifle," a pump-action shotgun with a pistol grip, a "[nine]-millimeter with the laser [sight,] … the gun that the victim had on the floor … a .380 or .38 … and … the .22" they brought with them.  James and Sholar then left with all of the guns except the AR-

6

15 with the grenade launcher and one of the gun bags, which stayed at Santiago's house.

¶11    Santiago testified that later that day at around 6:00 p.m., Milwaukee Police Department officers took him into custody and recovered J.W.'s bank cards, photo ID, the AR-15 rifle, as well as five additional weapons.  Santiago gave an initial statement to police at his residence after he was arrested claiming that Sholar and James called him and told him they were going to drop off some guns.

¶12    Santiago testified that "the first statements [he] gave were bull crap." However he testified that, after he was arrested and taken to the police station, he continued with the false story, but the officer questioning him tried to calm him and kept telling him to tell the truth.  The officer informed him that the police found the victim's ID in the search of Santiago's house.  The Milwaukee Police called J.W., who explained he had been robbed that day and had filed a police report with the Greendale Police Department.  Santiago decided to be truthful with the police because he had a record and J.W. had seen his face.  Santiago gave a second statement, briefly outlining what happened in the robbery.  Santiago was charged with armed robbery, burglary, and six counts of being a felon in possession of a firearm.

¶13    On cross-examination, Sholar's trial counsel and James's attorney questioned Santiago about inconsistencies in his testimony compared to his police statements including:  where he got the latex gloves and whether his co-conspirators wore them; the color of the getaway vehicle driven by Sholar; the color of the gun Sholar picked up from his brother at Burger King; and whether the co-conspirators discussed the possibility that J.W. might not be alone.  Further,

Santiago testified that the robbery took about five minutes from when they got J.W. to open the door until they left with the guns. Santiago testified that after the robbery, Sholar and James stayed maybe twenty minutes to a half-hour at his place.

¶14 Santiago testified that he pleaded guilty pursuant to a plea arrangement with the State in April 2012. Santiago agreed to plead guilty to an armed robbery charge and four counts of felon in possession of a firearm, and then the burglary and two felon in possession of a firearm charges were dismissed but read in. In return, the State offered him a sentence recommendation of thirty years, divided as twenty years of initial confinement and ten years of extended supervision.[6] The State clarified that Santiago agreed to testify, but he did not have an agreement with the State in exchange for his testimony. Santiago testified that he hoped to get a "lighter sentence" but the State had not made any promises. Santiago testified that after his guilty pleas were accepted, he gave a third statement, a debriefing interview, to police on June 12, 2012.

¶15 The State called a Milwaukee Police Department officer who analyzed Sholar's cell phone CSLI. The officer testified that he obtained records by subpoena for the phone number that had a billing name of Lamont Sholar and a billing address that matched Sholar's address. The call records included data from October 26 through October 28, 2010. The officer testified that he did an in-depth

---

[6] Santiago's testimony showed that he understood that his maximum exposure for prison was much higher. For the armed robbery charge, the maximum sentence was forty years, bifurcated as twenty-five years of initial confinement and fifteen years of extended supervision. Each possession charge carried a maximum penalty of ten years, evenly divided between initial confinement and extended supervision.

8

analysis for the call records from 1:45 p.m. until about 3:00 p.m. on October 27, 2010, which matched the time frame reported in the robbery investigation.

¶16    The officer testified that the forensic examination of Sholar's phone showed that there were two phone numbers associated with James saved to Sholar's contact list; that there were a number of incoming and outgoing calls from Sholar's phone number to Santiago's phone number; and that several calls had been deleted from Sholar's call log.[7]  The officer testified that he analyzed the originating cell location and the terminating cell location for the calls in the phone records for Sholar and Santiago's respective phones during the time surrounding the robbery.

¶17    The officer testified that the records showed there were six calls between 1:51 p.m. and 2:08 p.m. on Santiago's phone records and there were fourteen calls between 1:41 p.m. and 2:47 p.m. on Sholar's phone records.  The officer's analysis showed that for the calls from 1:42 p.m. through 2:08 p.m. Santiago's calls connected to a single Sprint cell tower and Sholar's calls connected to a single U.S. Cellular cell tower.  The officer explained that "when you see all of the calls taking place on the same tower and the same sector" and not switching over to another antenna "it means that the signal from the tower is pretty strong" and a search for the call location would start much closer to that

---

[7] The officer testified about the following calls deleted from Sholar's phone:  Santiago called Sholar on October 26, 2010, at 8:48 p.m., and on October 27, 2010, at 1:58 p.m., 2:07 p.m., 4:02 p.m., and 8:13 p.m., all of which were deleted from Sholar's phone.  The officer also identified outgoing calls from Sholar to Santiago on October 26, 2010, at 9:40 p.m., and on October 27, 2010, at 11:35 a.m., both of which were deleted from Sholar's phone.  Further, the officer identified six outgoing calls from Sholar to Santiago on October 27, 2010, from 1:42 p.m. to 1:53 p.m., all of which were deleted.  Then the officer testified that Sholar called Santiago at 2:08 p.m., a call that lasted more than eight minutes and was also deleted.

tower as opposed to the edges of the coverage area. The officer mapped out the cell tower locations and, using maps shown to the jury, presented the geographic range of the cell towers where Santiago and Sholar's phones connected to cell towers and the likely vicinity from where the calls were made. The location included the area of J.W.'s apartment in Greendale.

¶18     The jury returned guilty verdicts against Sholar and James for the counts charged in the information:  one count of armed robbery as a party to a crime against each of them and one count of burglary as a party to a crime, in which "the defendant arm[ed] himself with a dangerous weapon while in the enclosure" against each of them. The trial court ordered judgments of conviction in June 2014, and imposed consecutive sentences on Sholar:  twenty years for the armed robbery charge divided as fifteen years of initial confinement and five years of extended supervision, and eight years for the burglary charge divided as five years of initial confinement and three years of extended supervision. His sentences were consecutive to each other and to the active sentence he had in another case.

¶19     After sentencing, Sholar filed two motions for postconviction relief pursuant to WIS. STAT. § 809.30.[8]  In Sholar's original motion for postconviction relief filed in September 2017, he moved the circuit court for a new trial or alternatively an evidentiary hearing on his claims of ineffective assistance of

---

[8] Because the timeline to this current appeal is extensive, we note that we granted at least four extensions for the production of transcripts as well as eleven extensions of time for Sholar to bring his original motion for postconviction relief in September 2017. Further, in December 2018, we granted Sholar's motion to voluntarily dismiss his appeal of his original postconviction motion. This allowed him to pursue postconviction relief after the U.S. Supreme Court addressed CSLI in *Carpenter v. United States*, 138 S. Ct. 2206 (2018).

counsel, prosecutorial misconduct, and newly discovered evidence. In March 2018, the circuit court[9] denied Sholar's original motion for postconviction relief. In March 2018, he filed a notice of appeal, and in December 2018, we granted Sholar's motion to voluntarily dismiss his appeal of the March 2018 circuit court order denying postconviction relief. In April 2019, Sholar filed a supplemental motion for postconviction relief, alleging that the State obtained his CSLI in violation of the Fourth Amendment under the reasoning in the 2018 U.S. Supreme Court *Carpenter* decision. In August 2019, the circuit court[10] denied his supplemental motion. Sholar now appeals the denial of both of his postconviction motions. Additional facts are included in the discussion.

## DISCUSSION

¶20 Sholar seeks a new trial on multiple grounds. First, he argues that the police obtained his CSLI without a warrant, contrary to the Fourth Amendment, under *Carpenter*. Second, he argues that the State committed prosecutorial misconduct by permitting Santiago to testify falsely about his plea arrangement, thereby withholding the nature of Santiago's cooperation and plea agreement from the jury. Third, he contends that the State's modified recommendation at Santiago's sentencing constitutes newly discovered evidence. Fourth, he argues that he received ineffective assistance of counsel because (1) trial counsel failed to impeach Santiago with the transcript of his plea hearing;

---

[9] The Honorable T. Christopher Dee presided over Sholar's original motion for postconviction relief.

[10] The Honorable Michelle Ackerman Havas presided over Sholar's supplemental motion for postconviction relief.

(2) trial counsel failed to present inconsistencies in Santiago's statements; and (3) trial counsel broke a promise to the jury made in his opening statement.

### I. CSLI evidence

¶21 Sholar asks that this court reverse the circuit court, remand with instructions to order the suppression of Sholar's CSLI, and grant a new trial. Sholar argues that the CSLI evidence was obtained without a warrant, in violation of the Fourth Amendment. We review the circuit court's findings of historical fact under the clearly erroneous standard. *State v. Pender*, 2008 WI App 47, ¶8, 308 Wis. 2d 428, 748 N.W.2d 471. Whether suppression is required is a question of law that we review independently. *Id.* We conclude that Sholar has failed to prove a violation of his Fourth Amendment rights; therefore, suppression of the CSLI evidence was not required.

¶22 In 2018, the U.S. Supreme Court determined that due to "the unique nature of cell phone location records, the fact that the information is held by a third party does not by itself overcome the user's claim to Fourth Amendment protection." *Carpenter*, 138 S. Ct. at 2217. Therefore, the Court held that obtaining CSLI from a cell phone service provider amounts to a search and seizure. *Id.* at 2221.[11] In *Carpenter*, the government obtained CSLI "pursuant to a court order issued under the Stored Communications Act, which required the Government to show 'reasonable grounds' for believing that the records were 'relevant and material to an ongoing investigation.'" *Id.*; *see also*

---

[11] Because *Carpenter*, 138 S. Ct. 2206, was decided during the pendency of Sholar's direct appeal, the State does not dispute its application. *See Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) (holding that a new rule for the conduct of criminal prosecutions applies retroactively to all cases pending on direct review or not yet final).

18 U.S.C. § 2703(d). The Court concluded the showing under that Act fell "well short of the probable cause required for a warrant." *Carpenter*, 138 S. Ct. at 2221. Further, "[t]he Court usually requires 'some quantum of individualized suspicion' before a search or seizure may take place." *Id.* (citation omitted). The Court concluded that the government "must generally obtain a warrant supported by probable cause before acquiring such records." *Id.*

¶23 Sholar argues that his case is meaningfully indistinguishable from *Carpenter*; therefore, this court should order a new trial in which the CSLI evidence is suppressed. Sholar contends that his CSLI was obtained without a constitutionally adequate court order, specifically a warrant. The State argues that the analysis in *Carpenter* concluding that a subpoena was insufficient focused on the *showing* necessary to obtain the subpoena, not the *instrument* by which the government obtained the CSLI.[12] Here, the State obtained Sholar's CSLI by subpoena issued under WIS. STAT. § 968.375 (2009-10).[13] To authorize the search

---

[12] We note that Sholar does not argue that the affidavit supporting the subpoena could not have supported a showing of probable cause for a warrant; instead, he argues that the State did not seek a warrant.

[13] The State obtained Sholar's CSLI in 2010 on the basis of a subpoena granted under WIS. STAT. § 968.375 (2009-10). In 2010, that statute set forth the procedure to apply for a subpoena for records or communications of customers of an electronic communication service was "[u]pon the request of … a district attorney and upon a showing of probable cause, a judge may issue a subpoena requiring a person who provides electronic communication service … to disclose … a record or other information pertaining to a subscriber … including any of the following": (1) subscriber's name; (2) subscriber's address; (3) "[l]ocal and long distance telephone connection records, or records of session times and durations"; (4) length of service; (5) telephone number; (6) source and means of payment. § 968.375(3)(a). A subpoena under § 968.375(3) "may not require disclosure of the contents of communications." § 968.375(3)(b). Alternately, the procedure for warrant was: "Upon the request of … a district attorney and upon a showing of probable cause, a judge may issue a warrant requiring a person who provides electronic communication service or remote computing service to disclose … any of the following: []The content of a wire or electronic communication …." and any of the records or information listed available by subpoena. § 968.375(4).

of electronic communication service records by subpoena under the 2010 version of the statute, a judge was required to determine that probable cause existed under procedures comparable to issuing a search warrant. *Cf* WIS. STAT. §§ 968.375(3), (5) 968.12(2), (3).[14] The State contends that the subpoena by which the State obtained Sholar's CSLI was issued based on probable cause and was issued by a judicial officer, satisfying the demands of the Fourth Amendment and *Carpenter*.

¶24 In 2014, our supreme court addressed a similar challenge to a search for CSLI. *See **State v. Tate***, 2014 WI 89, ¶6, 357 Wis. 2d 172, 849 N.W.2d 798. The police requested a court order to obtain subscriber and cell tower activity and location information to track a suspect in a homicide. *Id.* The defendant "moved to suppress the evidence seized pursuant to the order to track his cell phone." *Id.*, ¶12. Our supreme court reviewed the three requirements for a search to comply with the Warrant Clause of the Fourth Amendment:

> (1) prior authorization by a neutral, detached magistrate; (2) a demonstration upon oath or affirmation that there is probable cause to believe that evidence sought will aid in a particular conviction for a particular offense; and (3) a particularized description of the place to be searched and items to be seized.

---

[14] Sholar argues that the probable cause showing for a warrant required by *Carpenter* must be higher than the probable cause showing for a subpoena under WIS. STAT. § 968.375(3) (2009-10). He asserts that § 968.375(5) merely describes that the process to get a subpoena for electronic communication records is the same as the search warrant application procedures: namely, by affidavit or by oral testimony. He contends that the statutory process to get a search warrant does not differentiate the level of probable cause required to get a subpoena versus a warrant. We decline to address this argument because it is unnecessary to resolve the issue before us: here, the only question is whether there was a sufficient showing of probable cause to support the search of Sholar's CSLI. As the U.S. Supreme Court frequently has remarked, "probable cause is a flexible, common-sense standard." ***Texas v. Brown***, 460 U.S. 730, 742 (1983). We generally decide issues on the narrowest possible grounds; therefore, we decline to address any general questions with regard to levels of probable cause to support a subpoena versus a warrant. *See **State v. Castillo***, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) ("An appellate court should decide cases on the narrowest possible grounds.").

*Id.*, ¶28 (quoting *State v. Sveum*, 2010 WI 92, ¶20, 328 Wis. 2d 369, 787 N.W.2d 317). Our supreme court concluded that the order was constitutionally sufficient because the circuit court determined that the probable cause standard had been met based on a police detective's sworn affidavit, which "described sufficient facts to support probable cause to believe that the cell phone site information law enforcement sought would aid in 'a particular apprehension or conviction for a particular offense.'" *Id.*, ¶33 (citation omitted). Therefore, under the analysis in both *Carpenter* and *Tate*, we must consider whether the application supporting the subpoena allowed the court to make the required determination of whether probable cause existed. Accordingly, we review the record to determine whether the affidavit provided a substantial basis for the court commissioner's determination that there was probable cause to believe that evidence of the two crimes for which Sholar was accused—armed robbery and burglary while armed—would be found in the CSLI. *See State v. Higginbotham*, 162 Wis. 2d 978, 992, 471 N.W.2d 24 (1991).

¶25 Our review of the relevant information in this record begins with the motion for a subpoena from a Milwaukee County Assistant District Attorney that stated that "the State believes that probable cause exists for the Court to find that the documents named in the attached Subpoena constitutes evidence of the crime of [a]rmed [r]obbery and [b]urglary [w]hile [a]rmed." The State's motion was based on an affidavit dated November 23, 2010, from a Greendale Police Department detective, who comprehensively outlined the investigation into the robbery on October 27, 2010. The detective reviewed the method and timeline of the robbery, the recovery of stolen guns and property at Santiago's residence, the separate arrests of Sholar and Santiago, and the search and seizure of Sholar, Santiago, and James's cell phones. The detective connected the known phone call

logs from Sholar, Santiago, and James's phone numbers to the other's phones at the times near the robbery. The detective requested that a subpoena be authorized for Sholar's phone records for service with U.S. Cellular, and Santiago and James's respective phone records for service with Sprint. The phone records sought included subscriber information, telephone connection records, and cell site towers, which could determine the location of these three men during the robbery and may provide evidence necessary for the investigation and prosecution of these crimes.

¶26 Based on the State's motion and the detective's affidavit, a Milwaukee County court commissioner issued a subpoena for the records of U.S. Cellular requesting all call detailing records, subscriber information, and cellular tower information for Sholar's phone during the time period October 26, 2010, from 12:00 a.m. through October 29, 2010, at 12:00 a.m. The order stated the court had "been shown specific and articulable facts showing probable cause under Wisconsin Statutes section[] 968.375" (2009-10). In the order, the court commissioner found that there was probable cause to believe that phone records described in an accompanying subpoena constituted evidence of the crimes of robbery while armed and burglary while armed.

¶27 When we compare the record to the three requirements to comply with the Warrant Clause of the Fourth Amendment, we conclude that the requirements are satisfied. First, the subpoena was issued by a Milwaukee County court commissioner before the records were released or searched, which complies with the requirement of prior authorization issued by a neutral, detached magistrate. *See Tate*, 357 Wis. 2d 172, ¶28. Second, the court commissioner relied upon the affidavit of the Greendale Police Department detective, which demonstrated that there was "probable cause to believe that evidence sought will

16

aid in a particular conviction for a particular offense." *Id.* (citation omitted). Third, the affidavit provided specific and particular descriptions of the records to be searched. *See id.*; *see also id.*, ¶41 (explaining that a cell phone electronic serial number "satisfies the particularity requirement because that number permits a particularized collection of cell site information for only one cell phone.").

¶28 The Fourth Amendment requires probable cause for a reasonable search and it is probable cause not the label of the instrument—warrant, subpoena, court order—that determines its constitutional sufficiency. We conclude that the showing of probable cause in the subpoena satisfied the requirements of the Fourth Amendment and the holdings of *Carpenter*. Sholar has failed to prove any clearly erroneous fact finding from the trial court. Therefore, we conclude the search of Sholar's CSLI was constitutionally sufficient. Accordingly, there is no basis to suppress the CSLI evidence under the Fourth Amendment.

¶29 Sholar argues that WIS. STAT. § 968.375 (2009-10) did not allow the State to obtain CSLI, even if the State had obtained a warrant. The State points out that Sholar did not make a statutory challenge to the acquisition of CSLI to the trial court and, therefore, forfeits this argument here. *See State v. Ndina*, 2009 WI 21, ¶30, 315 Wis. 2d 653, 761 N.W.2d 612 (holding that the failure to object at trial constitutes a forfeiture of the right on appellate review). Furthermore, we interpret Sholar as conceding this issue in his reply brief, stating, "Sholar does not separately seek suppression based on the State's failure to comply with the subpoena statute[.]" He continued, "While the State's violation of the subpoena [statute] is not a separate basis for suppression, it is evidence of the lack of good faith by the officers." We note that Sholar raised the statutory challenge in his

motion for postconviction relief, but his motion to suppress evidence to the trial court did not address the statutory challenge to CSLI acquisition.[15] Because we have concluded that the subpoena was constitutionally sufficient and we do not reach the question of whether the search was acceptable under the good faith exception, we decline to address Sholar's argument any further.

## II. *Prosecutorial misconduct*

¶30 Sholar argues that the State committed prosecutorial misconduct by permitting Santiago to testify falsely about his plea agreement in order to bolster his credibility. Sholar contends that Santiago lied repeatedly on the stand, claiming that there was no agreement for his testimony and that he could only hope for a reduction in the sentencing recommendation. The State argues that Santiago testified truthfully about his guilty pleas and the State's recommendation. It points out that the circuit court was not persuaded that Santiago gave false testimony about the plea agreement. In the first postconviction decision, the circuit court stated that it was "clear from his testimony that Santiago hoped that

---

[15] Sholar's motion to suppress evidence requested:

> an order suppressing all evidence including but not limited to a cell phone taken from Mr. Sholar's home; the fruits of a warrantless search and arrest.
>
> AS GROUNDS for this motion, Mr. Sholar states that Milwaukee Police officers illegally entered and searched his residence without a warrant, without valid consent; and without exigent circumstances, and arrested him on October 28, 2010 in violation of his rights under the 4th, 5th, and 14th amendments of the United States Constitution and Article I sections 7, 8, 9 and 11 of the Wisconsin Constitution. Officers seized Mr. Sholar's cell phone.

he would receive a lesser sentencing recommendation but that he did not know what the State's final recommendation would be."

¶31    When we review a claim of prosecutorial misconduct, we consider whether "the defendant [was] denied his or her due process right to a fair trial." *State v. Wolff*, 171 Wis. 2d 161, 167, 491 N.W.2d 498, (Ct. App. 1992).  We consider the entire record to determine whether prosecutorial misconduct affected the fairness of the trial.  *See **State v. Bvocik***, 2010 WI App 49, ¶13, 324 Wis. 2d 352, 781 N.W.2d 719.  Our examination of the record here does not show misconduct by the prosecutor.  We conclude Sholar's claim is baseless.

¶32    During the trial, Santiago was extensively questioned about his plea arrangement with the State.  Over and over, Santiago expressed that he "hoped" for a modification in the State's sentence recommendation in his charges, but that he understood that the State offered him twenty years of initial confinement and ten years of extended supervision.  Those were the terms under which the circuit court[16] accepted Santiago's guilty pleas on April 30, 2012, and entered a judgment of conviction.  We recite this direct examination at trial:

> [THE STATE:]  And you agreed to come testify today?
>
> [SANTIAGO:]  Yes.
>
> [THE STATE:]  What is your understanding about any agreement about your testimony?
>
> [SANTIAGO:]  There was none.
>
> [THE STATE:]  What do you hope happens?
>
> [SANTIAGO:]  A lesser sentence....

---

[16] The Honorable Rebecca F. Dallet accepted Santiago's guilty pleas.

[THE STATE:] You've not been promised that if you come here and testify that you're going to get a particular sentence?

[SANTIAGO:] No.

….

[THE STATE:] Okay. Did you talk to police officers after you pled guilty?

[SANTIAGO:] Correct.

[THE STATE:] And why did you talk to them after pleading guilty?

[SANTIAGO:] Because the first statements I gave were bull crap. I was nervous. I just wanted the case as far off of me as possible, so I just kind of made up some things at the beginning.

….

[THE STATE:] The plea agreement that you entered into, it was your understanding that if you testify and provide a statement to police officers that you -- that that recommendation might change?

[SANTIAGO:] Correct.

[THE STATE:] But nothing has been promised to you?

[SANTIAGO:] No, not at all.

[THE STATE:] You hope it changes?

[SANTIAGO:] I do hope it changes, yes.

¶33     In March 2014, after Sholar's trial ended with guilty verdicts (but before the trial court sentenced Sholar), Santiago faced sentencing by the trial court on his guilty pleas. At Santiago's hearing, the prosecutor reviewed Santiago's cooperation with the prosecution, his initial plea offer, his debriefing with law enforcement, and his testimony at Sholar and James's trial. The State modified its recommendation to ten years, bifurcated evenly between initial

confinement and extended supervision. The trial court reviewed the case on the record and imposed concurrent sentences for all charges against Santiago for a term of seven-and-a-half years, divided as two-and-a-half years of initial confinement and five years of extended supervision.

¶34 The circuit court found that Santiago truthfully testified to the plea agreement between the prosecutor and Santiago, and this determination was not clearly erroneous. Sholar contends that the prosecutor knew Santiago's testimony was untrue because at Santiago's plea hearing, Santiago's attorney stated that the sentence recommendation "will change." But the record shows that the State quickly responded that it would change if his testimony was fruitful. Sholar further asserts that by the time of the trial, the prosecutor knew that Santiago's statements had been helpful enough to allow the State to refile charges against Sholar. However, Sholar's assertion does not prove that there had been any changes from the previous plea agreement. Santiago's testimony clearly stated what the State recommended for his sentence and that there was a possibility of a modified recommendation. Further, the record reflects that the prosecutor only changed its recommendation from thirty to ten years at Sholar's sentencing hearing. It was the trial court—whom we note conducted Sholar's trial and heard Santiago's testimony first-hand—who imposed an even more reduced sentence. We conclude that there is no factual support in the record to show that Santiago believed there was a different agreement than the one that he testified to or that he believed he was guaranteed a sentence modification.

¶35 We conclude that the record is clear that the prosecutor did not commit misconduct. Accordingly, we reject Sholar's claim of prosecutorial misconduct.

## III.   *Newly discovered evidence*

¶36   Sholar argues that Santiago's sentence constitutes newly discovered evidence.  He argues there are two parts to this evidence:  first, that after Sholar was convicted, the State reduced its recommendation for Santiago's sentence from thirty years to ten years, and second, that the trial court only imposed seven-and-a-half years, with only two-and-a-half of those years in initial confinement.  Sholar argues that had the jury heard how significant a sentence reduction Santiago received for testifying against Sholar, it would have further undermined Santiago's credibility.

¶37   "In order to set aside a judgment of conviction based on newly[]discovered evidence, the newly[]discovered evidence must be sufficient to establish that a defendant's conviction was a 'manifest injustice.'"  ***State v. Plude***, 2008 WI 58, ¶32, 310 Wis. 2d 28, 750 N.W.2d 42 (citation omitted).  A postconviction motion based on newly discovered evidence must establish by clear and convincing evidence that:  "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative."  ***State v. Love***, 2005 WI 116, ¶43, 284 Wis. 2d 111, 700 N.W.2d 62 (citation omitted).  If these factors are proven, the trial court must then determine "whether a reasonable probability exists that a different result would be reached in a trial."  ***Id.***, ¶44 (citation omitted).  "A reasonable probability of a different outcome exists if there is a reasonable probability that a jury, looking at both the old evidence and the new evidence, would have a reasonable doubt as to the defendant's guilt."  ***State v. Vollbrecht***, 2012 WI App 90, ¶18, 344 Wis. 2d 69, 820 N.W.2d 443.  We review the trial court's decision to grant or deny a motion for a new trial based on

newly discovered evidence under the erroneous exercise of discretion standard. *See **Plude***, 310 Wis. 2d 28, ¶31.

¶38     Sholar argues that Santiago's greatly reduced sentence fulfills all five prongs of newly discovered evidence such that a manifest injustice has taken place, requiring a new trial. He argues (1) that Santiago was sentenced to a dramatically reduced sentence after Sholar's trial was complete; (2) that he was diligent in seeking this information; (3) that the jury had concerns about Santiago's credibility, therefore, his motivations to testify were material to the case; (4) that Santiago's seven-and-a-half year sentence was not cumulative to the testimony at trial; and (5) that a reasonable probability exists that the jury would alter its verdict because it would have reasonable doubt about Sholar's guilt.

¶39     The State argues that Sholar fails to satisfy the newly discovered evidence standard because this evidence is cumulative to the testimony heard at trial. Santiago's testimony repeatedly made clear that he hoped for a sentence recommendation modification as the result of his testimony. The State contends that Santiago's hopes for a significant reduction was even introduced during cross-examination.

> [TRIAL COUNSEL:]   In the June 12th, 2012, debrief, at the end of the – I'm going to direct you to the end of your interview with the police. You said, "I'm hoping I go from here to here." Remember using that gesture going up and going down like that?
>
> [SANTIAGO:]  I don't remember that.
>
> [TRIAL COUNSEL:]   You don't remember that? Okay. You remember saying something – you remember saying --
>
> [SANTIAGO:]  I might have said something along the lines though.

23

[TRIAL COUNSEL:]  Something along the lines of you're hoping that to get it from 20 years to some very short period of time, right?

[SANTIAGO:]  Yes.

[TRIAL COUNSEL:]  So you don't want to disappoint [the prosecutor] because she's the one who is going to be making that sentencing recommendation, right?

[SANTIAGO:]  Yeah.  But the judge ultimately has the say so.

[TRIAL COUNSEL:]  Right.  Who is your Judge in that case?

[SANTIAGO:]  Judge Watts.

Furthermore, the State argues that Sholar fails to satisfy the standard because there is no reasonable probability of a different outcome at trial if the jury heard about Santiago's reduced sentence and it undermined Santiago's credibility as a witness. The State asserts that the jury had the information to form its own opinions about Santiago's motivations and assess his credibility as a witness.

¶40   The record further reflects that the jury heard about Santiago's plea agreement and motivations because the trial court allowed the jury to ask questions.  One of the questions submitted by the jury to the court—in writing and read by the judge—was directed at Santiago:  "You said a couple of times that you didn't have an agreement with the State and just a few minutes ago you agreed to having one or an agreement.  Are you lying about one now or saying the truth?"  Santiago then testified:

It wasn't that I was lying when I said we didn't have an agreement.  Every time the lawyer said, "agreement," I didn't understand what he was saying.

I was thinking the plea.  When he verified he meant plea bargain and he said agreement, yes, that was my plea bargain when I first went to court was 20 in 10 out.

24

> I hadn't had no other plea bargain since then. I didn't think of it as an agreement. I didn't know -- When he said agreement, I think of an agreement as she's telling me, okay, you do this and I'll do that for you. That's an agreement. It was a plea bargain. I just heard, you're facing 20 in and 10 out. That's all I heard.

Additionally, Santiago testified that there was no agreement with the State in which the State would help him or lessen his sentence in exchange for his testimony; Santiago reiterated that he hoped that his testimony would reduce his eventual sentence. Ultimately, the trial court gave the jury the opportunity to request additional information, and the jury directly questioned Santiago about his truthfulness.

¶41 The record also reflects that the jury was aware that Santiago had not been sentenced when he testified and that he hoped for a greatly reduced recommendation. In effect, Sholar is arguing that the actual change in the recommendation at the time of sentencing supports his conclusion that there was an agreement at the time of trial. However, that is mere speculation and is conclusory. As we concluded in the discussion above, there is no evidence in the record that there was a different agreement between the State and Santiago. Without a hidden agreement now revealed, Santiago's sentence is not newly discovered evidence. Accordingly, we conclude that Sholar fails to satisfy all of the required prongs of the newly discovered evidence standard and this claim fails.

*IV.    Ineffective assistance of counsel*

¶42 Sholar argues that trial counsel provided ineffective assistance in at least three instances that were both deficient and prejudicial, which, individually

or cumulatively, would compel us to order a *Machner*[17] hearing. His first claim relates to Santiago's plea agreement, a different framing of his arguments above. He contends that trial counsel failed to impeach Santiago with testimony from his plea hearing, which Sholar argues would have shown that Santiago was promised a reduced sentence recommendation. Second, he asserts that trial counsel failed to impeach Santiago regarding multiple inconsistencies between his prior statements to police and his trial testimony. Third, he argues that trial counsel promised the jury in his opening statement that he would introduce evidence about two men who were found with firearms stolen in the robbery at J.W.'s apartment. However, trial counsel did not return to this topic and therefore, Sholar argues that trial counsel harmed his own credibility and by extension, Sholar's credibility. We reject all three arguments.

¶43    To prove ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the defendant was prejudiced by counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). For the first prong, "[c]ounsel's conduct is constitutionally deficient if it falls below an objective standard of reasonableness." *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305. For the second prong, the defendant must show prejudice by counsel's performance. *Strickland*, 466 U.S. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In our analysis, we "may reverse the

---

[17] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

order of the two tests or avoid the deficient performance analysis altogether if the defendant has failed to show prejudice" from counsel's performance. *See* ***State v. Johnson***, 153 Wis. 2d 121, 128, 449 N.W.2d 845 (1990).

*A. Trial counsel's failure to impeach Santiago's testimony about the plea agreement*

¶44    Sholar asserts that trial counsel was ineffective for not impeaching Santiago with the transcript of his plea hearing. As he asserts in his claim of prosecutorial misconduct, Sholar contends that the State promised to reduce its recommendation in exchange for Santiago's testimony. When the circuit court reviewed these arguments, the court found that the State did not promise or guarantee a change in the sentencing recommendation. In its postconviction decision, the court stated:

> The defendant makes far too much of the statement made by Santiago's attorney at his plea hearing that the recommendation "will change." The full context of the plea hearing transcript shows that a lesser recommendation was not a promise or guarantee and that it was "subject to change *if* something becomes fruitful" and that it was "possibly subject to change."

¶45    We agree. If trial counsel had tried to impeach Santiago with only the plea hearing transcript in which Santiago's attorney stated there will be a change, then the State would have introduced the next section of the transcript, which showed that the State did not make any promises or guarantees. Trial counsel was not deficient for not cross-examining Santiago with the plea hearing testimony when that testimony would have only made it clear that the State did not promise Santiago a change in its recommendation in return for this testimony. Furthermore, the plea hearing colloquy would have only reinforced to the jury that the State did not promise Santiago it would change its sentencing

27

recommendation; therefore, trial counsel's failure to pursue this line of testimony was not deficient. We conclude that the record conclusively demonstrates that Sholar has failed to show that trial counsel performed deficiently in his first claim regarding Santiago's plea arrangement.

*B. Trial counsel's failure to impeach Santiago's inconsistent statements*

¶46 Sholar argues that trial counsel failed to impeach multiple inconsistent statements by Santiago. Sholar contends that while trial counsel understood that Santiago's testimony was the most important part of the State's case, counsel failed to prepare to impeach Sholar either by being ready with police reports and recordings of his police statements or by subpoenaing the officers who were present for his statements to testify at trial. Sholar argues that without Santiago's testimony, the officer's testimony about CSLI would only establish Sholar was in the vicinity of the robbery.

¶47 Sholar argues that there were inconsistences in Santiago's testimony and statements about whether they wore latex gloves during the robbery and the co-conspirators actions after the robbery when they returned to his residence with the guns. The State argues both issues are minor inconsistencies and Sholar is unable to show that there is a reasonable probability of a different outcome at trial if Santiago had been cross-examined more directly on either point. We agree with the State, and note that Sholar does not refute the State's arguments in his reply brief. We take this lack of reply as a concession by Sholar that neither issue prejudiced his defense. *See **United Coop. v. Frontier FS Coop.***, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in respondent's brief may be taken as a concession).

¶48     As noted, Sholar conceded the State's argument regarding the latex gloves and co-conspirators actions when they returned to Santiago's residence with the guns.  Therefore, our analysis focuses on Sholar's claim that Santiago's account of Sholar's entry to J.W.'s apartment was inconsistent.   In 2010,[18] Santiago told police that Sholar entered the apartment at the same time as Santiago and James, after Santiago's successful process server ruse.   In the June 2012 police debriefing interview, Santiago told police that Sholar waited in the car until Santiago and James entered the apartment, and James let Sholar in the back door of the apartment.   At trial, Santiago testified that Sholar waited in the car until Santiago and James entered the apartment, Santiago called Sholar and then let him in through the kitchen door.

¶49     The State argues that the jury heard about this inconsistency during trial counsel's cross-examination of Santiago.   It also points out that James's attorney asked Santiago about telling the police that Sholar rushed in with James, which Santiago then testified he did not remember.   Our review of the record reflects the jury was aware of this information.   The record conclusively shows that there is no reasonable probability of a different result at trial; therefore, there is no prejudice to Sholar's defense.   Accordingly, this claim of ineffective assistance of counsel fails.   *See Thiel*, 264 Wis. 2d 571, ¶80.

---

[18] Santiago admitted on the witness stand that his first statement to the police was self-serving and that he lied to the police about his involvement in the robbery.  For this argument, Sholar instead relies on Santiago's second statement at the police station on the night of October 27, 2010.

*C. Trial counsel's failure to keep his promise to the jury*

¶50     Sholar's final argument is that trial counsel was ineffective for breaking the promise he made to the jury in his opening statement. We start by reciting the relevant part of trial counsel's opening statement:

> Now, this was in addition to James Luna [who w]as actually another individual in the months after this robbery occurred where … another gun from a robbery was found in the hands of someone named Cornelius Rainey. I believe the evidence will show that.
>
> And again, Cornelius Rainey -- There was not really any follow-up, any attempt to see if [J.W.] could identify that individual as a person who participated in the robbery, or even perhaps a debrief to figure out if they could establish a chain of custody from the robbery, to the time that these two this individual, Mr. Rainey, Luna …. There was no attempt to do a chain of custody, to attempt to go backwards from how the guns wound up in those individual's hand to see if they could -- they can tie those things back to Mr. Sholar or Mr. James.
>
> ….
>
> If all these guns were taken, where are the guns? And where's the connection and where's the tie to Mr. Sholar?

¶51     Sholar argues that his trial counsel's failure to follow up on the promise to the jury harmed his trial counsel's credibility and Sholar's own credibility. He further asserts that there was no reasonable strategic basis for trial counsel to promise to present this information and fail to follow up on it. Sholar contends this lapse critically undermined the jury's willingness to believe the defense.

¶52    After opening statements,[19] the only reference to Luna or Rainey occurred in Sholar's defense case, when Sholar's trial counsel recalled one of the police officers who questioned Santiago in the debriefing interview in June 2012. Trial counsel questioned the officer as follows:

> [TRIAL COUNSEL:]  How many addresses does it reference there for weapons recovered?
>
> [OFFICER:]  Three.
>
> [TRIAL COUNSEL:]  Were you ever aware of a Cornelius Rainey that was — that came to be in possession of some of these stolen weapons?
>
> [OFFICER:]  No.
>
> [TRIAL COUNSEL:]  How about James Luna?
>
> [OFFICER:]  No.
>
> [TRIAL COUNSEL:]  Okay.  So you weren't involved in any of that investigation?
>
> [OFFICER:]  No.

¶53    Sholar relies on *State v. Coleman*, 2015 WI App 38, 362 Wis. 2d 447, 865 N.W.2d 190, to support his argument that failing to live up to a promise made in an opening statement can constitute prejudice in an ineffective assistance inquiry.  In *Coleman*, "[n]ot only did counsel unambiguously assure the jury that Coleman *would* testify, but he told the jury that 'he [has] to testify' and that 'It's my call to make [as] a defense attorney.'"  *Id.*, ¶43.  The defendant did not testify and counsel failed to "blunt the impact of his unfulfilled promise in his closing argument when he did not offer an explanation for why Coleman did not testify."

---

[19] The record reflects that James's attorney also referenced Luna in his opening statement, James rested after the State's case ended, and James made no further inquiries about Luna.

*Id.* We concluded that defense counsel was wrong on the law and the facts and that we could not discern a reasonable strategy in this course of conduct. *Id.*

¶54    The State argues that trial counsel's failure to develop the topic of Luna and Rainey did not harm Sholar's credibility in the same manner that Coleman's counsel's promise harmed his client. *See id.*, ¶29. The State further points out that Coleman's counsel was found ineffective based on cumulative deficits in his representations, including the failure to live up to his opening promise, but also failing to impeach witnesses and disclosing prejudicial facts about his client during voir dire. *Id.*, ¶¶41-46. Additionally, the State asserts that it is unclear how trial counsel could have further raised questions about Luna and Rainey. The State contends, and the trial record reflects, that there is no proof that those men were involved in the robbery, and trial counsel's own opening statement protested that the State made "no attempt to do a chain of custody, to attempt to go backwards from how the guns wound up in those individual's hand to see if they … can tie those things back to Mr. Sholar or Mr. James." Even if we were to assume that trial counsel was deficient for failing to live up to a promise to the jury, Sholar has not shown the prejudice to his defense from this action. We conclude that the record conclusively demonstrates there is no reasonable probability of a different trial outcome; therefore, Sholar has not shown prejudice and his claim for ineffective assistance of counsel fails.

### D.  Trial counsel's cumulative deficiencies

¶55    Sholar makes a final argument that the cumulative effect of counsel's errors were overwhelming to his defense. When the "cumulative effect of defense counsel's deficiencies undermines our confidence in the reliability of the proceedings" we conclude that the defendant's defense was prejudiced.

*Coleman*, 362 Wis. 2d 447, ¶40. Sholar argues that trial counsel repeatedly failed to take advantage of opportunities to discredit Santiago including pursuing evidence of Santiago's plea agreement, impeaching Santiago's inconsistent statements, and connecting the robbery to third-parties. The State argues that these alleged errors are insufficient to undermine confidence in the proceedings because the evidence against Sholar was strong. The State relies on the general consistency between J.W.'s and Santiago's testimony about the course of the robbery and the CSLI data putting Sholar near the robbery site and in communication with Santiago. Reviewing Sholar's allegations individually or cumulatively, we conclude that the record conclusively demonstrates there has been no prejudice to his defense; accordingly, his claims of ineffective assistance of counsel fail.

## CONCLUSION

¶56 We conclude that Sholar is not entitled to a new trial. First, we conclude that the State did not violate Sholar's Fourth Amendment rights by obtaining his CLSI data, and accordingly, that his conviction was not obtained contrary to *Carpenter*. Second, we conclude that the prosecutor did not commit misconduct because Santiago's plea agreement was not misrepresented in these proceedings. Third, we conclude that Sholar has failed to show newly discovered evidence in the form of Santiago's final sentencing, because again, there was no plea agreement about which the jury was uninformed. Finally, we conclude that the record conclusively demonstrates that there was no reasonable probability that the results of the trial would have been different but for trial counsel's performance. Sholar has not shown that either prong of an ineffective assistance of counsel inquiry was satisfied and a *Machner* hearing is not required.

Accordingly, we affirm his judgment of conviction and the postconviction orders denying him relief.

*By the Court.*—Judgment and orders affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.