COURT OF APPEALS
DECISION
DATED AND FILED

May 5, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2176-CR**

Cir. Ct. No. **2017CF4**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

DAVID RAY GRAF,

    DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for St. Croix County: EDWARD F. VLACK III, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. David Ray Graf appeals a judgment convicting him of first-degree sexual assault of a child (sexual contact with a person under

age 13). Graf also appeals an order denying his motion for postconviction relief, which sought a new trial based on the alleged ineffective assistance of Graf's trial attorney. We conclude that with respect to each of Graf's six ineffective assistance claims, Graf has failed to show either that his trial attorney performed deficiently or that counsel's alleged errors prejudiced his defense. We therefore affirm.

## BACKGROUND

¶2 The charge against Graf arose from an allegation that, on a single instance around Memorial Day in 2015, Graf brought his then-four-year-old grandniece, Anne,[1] into a camper; pulled down her pants; kissed her vaginal area; and then gave her a dollar in exchange for keeping it a "secret." Although the complaint alleged that Anne told her parents—Alan and Hannah—about the assault the next day, Alan and Hannah did not report the assault to the police until August 2016.

¶3 The case proceeded to a four-day jury trial in October 2021. At trial, Alan testified that although Graf was his uncle, Graf was actually more of a father figure to him, and he lived with Graf for a time after his parents passed away when he was 16. Alan and Graf were also co-owners of a property management company.

¶4 Alan testified that shortly after Memorial Day in 2015, he and his family were at Graf's residence in Star Prairie, Wisconsin. Hannah was painting

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2023-24), we refer to the victim and her parents using pseudonyms. All references to the Wisconsin Statutes are to the 2023-24 version.

at the property, but Anne became upset, so Alan left with Anne and Anne's older brother to allow Hannah to finish painting. On the way home, Anne was upset about a dollar that she had received the day prior but then lost, and she used the word "secret," which "caused [Alan] to want to know" where she had gotten the dollar. After additional questioning by Alan, Anne stated that Graf had kissed her, and when Alan asked where, Anne pointed to her vaginal area.

¶5 Alan testified that he became enraged and immediately drove back to Graf's residence, where he screamed at Hannah that she needed to leave immediately. When Graf asked what was the matter, Alan responded, "You know what the 'F' you did, stay the 'F' away from my family." Alan explained that after that day, he "cut off all contact" with Graf "unless absolutely necessary," but "it wasn't possible to completely separate" from Graf because he and Hannah were both employed by the property management company that he and Graf co-owned. Alan further testified that he delayed reporting the assault to the police because Graf was like a father to him and because his livelihood depended on the company that they owned together.

¶6 Alan testified that he told Anne not to talk about the assault. However, Anne eventually disclosed the assault to a teacher or teacher's assistant and to Alan's mother-in-law. Alan further testified that his business relationship with Graf had become unsustainable because he "couldn't stand seeing or hearing [Graf] anymore." As a result, Alan ultimately reported the assault to the police in August 2016. Alan testified that reporting the assault damaged his relationships with several family members.

¶7 On cross-examination, Alan conceded that he had only a 48% ownership interest in the property management company that he and Graf

co-owned. He admitted that, during 2015 and 2016, he had wanted to purchase 100% ownership of the company. In July 2016, Alan and Graf reached an agreement for Alan to buy the company for $1.5 million. However, on August 5, 2016, Alan sent Graf a letter canceling the purchase agreement, and "[a] couple of days later," he reported Graf's sexual assault of Anne to the police. Alan conceded that, at that time, he knew that "if somebody was charged with a felony it would be grounds for the denial of their [brokerage] license," but he denied that he reported the assault because he had "an interest in getting [Graf] charged with a serious crime that would take away his license." Alan further testified that he canceled the purchase agreement because of "other concerns about the business."

¶8     Alan admitted that after he canceled the purchase agreement and reported the assault to the police, both he and Hannah continued to work at the property management company. However, he testified that Graf fired them both on around September 9, 2016. On the day they were fired, Hannah screamed at Graf, and the police were called. Alan denied telling Graf that day, "You can't run the company from prison."

¶9     Alan also denied on cross-examination that his grandmother, Ethel Graf, told him to call the police and report the assault. On redirect examination, Alan testified that Ethel's "specific words" to him were, "No good will come of it."

¶10     Hannah testified that on the day of the assault, she arrived at Graf's home in the afternoon with Anne and Anne's younger brother, who was an infant. She testified that both Graf and his wife Judy were at the property when she arrived. Hannah was painting inside the house, which Graf and Judy had recently purchased, and Judy was inside helping Hannah with the baby. Hannah testified

that while she was painting, Anne and Graf "were in and out of the house, and in the [camper], and outside in the backyard." She remembered Graf cutting the grass, and she testified that Anne was riding with Graf on the lawnmower. She also testified that Graf and Anne were "emptying … out" the camper following a trip the Grafs had taken to Arizona. Hannah and the children left Graf's residence sometime in the evening. As they were leaving, Graf told Hannah that he had given Anne a dollar "because she was helping him move things and build things," and he also stated that he told Anne the money was a "secret" so that Anne's older brother "wouldn't get mad."

¶11 Hannah testified that she returned to Graf's house the following day with the baby to continue painting. Graf repeatedly asked her if Anne had told her what the secret was, and she responded, "No. You already told me what the secret was." At some point, Alan came to the house with Anne and Anne's older brother to pick up the baby so that Hannah could finish painting. About five minutes after Alan and the children left, they returned to the house, and Alan was "very upset" and demanded that Hannah leave the residence. Hannah confirmed that Alan yelled at Graf and said something to the effect of, "Stay away from my family." After they left Graf's home, Anne told Hannah that Graf had pulled down her pants and kissed her vaginal area. The next day, Hannah texted Graf that he was a "piece of shit" and "knows what he did."

¶12 Hannah testified that she wanted to report the assault to the police right away, but Alan "was confused" and "didn't want to believe it" because Graf was "like a father-figure to him." Hannah further testified that Alan discussed the matter with his grandmother, Ethel, who "said it would just make things worse, don't go to the police."

¶13    On cross-examination, Hannah reiterated that on the day of the assault, Graf told her about giving Anne a dollar and stated it was for helping him build shelves. Hannah testified that she saw Anne helping Graf build shelves in a detached garage on the property. Hannah acknowledged that Graf sometimes built stands for remote-controlled airplanes, but she denied that any such stands were in the detached garage on the day of the assault. Hannah also testified that Judy was inside the house with Hannah "[f]or the most part" that day, and she denied that Judy was going "back-and-forth" to check on Anne and Graf.

¶14    Hannah further testified on cross-examination that she was hired to work for Alan and Graf's property management company in either the summer of 2015 or the prior summer. She confirmed that both she and Alan continued working for the company after they reported the assault to the police in August 2016, but they did not tell Graf that they had reported the assault. In September 2016, Graf changed the locks on the company's office and communicated his intent to fire Hannah and Alan. Hannah conceded that on the day she learned of the firing in September 2016, she became upset with Graf, she screamed at him, and the police were called. When asked whether she yelled at Graf, "You can't run the company from prison," Hannah responded, "I don't know what I yelled, so I can't agree if I said that or not. I know I said things." She acknowledged, however, that she knew Graf would not be able to run the business if he were in prison.

¶15    A video recording of Anne's forensic interview with Lieutenant Brandie Hart of the St. Croix County Sheriff's Office was played for the jury. During the interview, Anne was shown a body diagram and asked whether anyone had ever touched her on parts shown on the diagram in a way that made her feel "scared or sad or uncomfortable." Anne responded that she did not want to "tell

the story" because "a long time ago" her dad told her not to do so and that, if she did, she "might be grounded." Hart then brought Alan into the room to reassure Anne that she would not get in trouble for speaking with Hart.

¶16     Anne subsequently told Lieutenant Hart that Graf had pulled down her pants and underwear and kissed her "private area" while she and Graf were "[i]n his camper where nobody was." After the assault, Anne told Graf that she was going to tell her dad, and she may also have slapped Graf in the face and told him that she hated him. Graf then "rushed outside and went in his house." Anne stated, "I think he got a gun or something," but she then stated she could not remember. Anne denied that Graf gave her candy, money, or anything else after the assault. She stated that she told her dad about the assault "the same day," and her dad "yelled at [Graf]" and said "you know what you did."

¶17     Lieutenant Hart testified that she interviewed Graf in September 2016, and he denied being in the camper with Anne on the day of the assault. Graf confirmed that he had given Anne money, but he stated it was for helping him build stands for remote-controlled airplanes. He also stated that it was Anne's idea to keep the money a secret because she did not want her older brother to know that Graf had given her money for helping him. On cross-examination, Hart acknowledged that during her 2.5-hour interview with Graf, he repeatedly and consistently denied sexually assaulting Anne.

¶18     Lieutenant Hart also acknowledged on cross-examination that Anne made some statements during her forensic interview that appeared to be incorrect. For instance, Anne incorrectly stated that her mother was not present at Graf's residence during the assault but that her father and older brother were. Additionally, Anne stated during the forensic interview that she had been pecked

by Graf's bird on the day of the assault, but Hannah had testified that did not happen.

¶19    Graf chose not to testify in his own defense, and the defense rested without presenting any evidence.  In closing, the defense argued that Anne's "story" regarding the sexual assault "doesn't make sense" and "doesn't ring true"; that Alan and Hannah had "coached" Anne; and that Alan "had a motive to make everyone believe" that Graf had sexually assaulted Anne.  The defense also emphasized both the significant delay in reporting the sexual assault and Lieutenant Hart's "admitted failed duty to investigate certain matters."[2]  The defense argued that all of these factors, taken together, combined to create a reasonable doubt as to Graf's guilt.  The jury rejected this argument, however, and found Graf guilty of the single charge of first-degree sexual assault of a child.

¶20    Graf moved for postconviction relief, arguing that his trial attorney was constitutionally ineffective by: (1) failing to adequately review records from a civil lawsuit between Alan and Graf; (2) failing to present certain evidence regarding Alan's bias and motive to lie; (3) "[p]romising substantial facts" in his opening statement that were ultimately not presented at trial; (4) failing to call Judy as a witness; (5) failing "to investigate and present corroborating physical evidence and witnesses to dispel various false claims by the State's witnesses"; and (6) failing to seek admission of Ethel Graf's prior statements under WIS.

---

[2] For instance, Lieutenant Hart had admitted during her trial testimony that she never "did any investigation of the … camper"; that she did not perform any follow-up investigation after speaking with Ethel Graf on October 3, 2016; that she did not investigate Anne's statement that Anne would be punished if she talked about the assault; and that she did not ask Judy about Anne's claim that Anne had been pecked by Graf's bird on the day of the assault.

STAT. § 908.06 in order to refute Alan's and Hannah's testimony that Ethel told Alan not to call the police.

¶21   The circuit court held a two-day *Machner*[3] hearing, during which the defense presented testimony from Graf; Judy; Graf's neighbor, Robert Tauber; and Graf's trial attorneys, Aaron Nelson and Paul Rogosheske.[4]   Following the *Machner* hearing, the court issued a 123-page written order denying Graf's postconviction motion in its entirety.

¶22   Graf now appeals.   Additional facts will be provided below as relevant to our discussion of Graf's ineffective assistance claims.

**DISCUSSION**

¶23   To prevail on an ineffective assistance claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  If a defendant fails to make a sufficient showing on one prong of the *Strickland* test, we need not address the other.  *Id.* at 697.

¶24   To prove deficient performance, a defendant must point to specific acts or omissions by counsel that are "outside the wide range of professionally competent assistance."  *Id.* at 690.  We strongly presume that "counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689, and

---

[3]  *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

[4]  Graf was initially represented by Attorney Rogosheske.  Graf retained Attorney Nelson to represent him in October 2019, but Attorney Rogosheske continued on as co-counsel. Attorney Nelson acted as lead counsel at Graf's trial, and Graf's ineffective assistance claims pertain only to Attorney Nelson's conduct.

we are highly deferential to counsel's strategic decisions, as long as they are objectively reasonable, *State v. Mull*, 2023 WI 26, ¶35, 406 Wis. 2d 491, 987 N.W.2d 707. "We will not 'second-guess a reasonable trial strategy, [unless] it was based on an irrational trial tactic or based upon caprice rather than upon judgment.'" *Id.* (alteration in original; citation omitted).

¶25 To demonstrate prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The defendant "need not prove the outcome would 'more likely than not' be different in order to establish prejudice." *State v. Sholar*, 2018 WI 53, ¶44, 381 Wis. 2d 560, 912 N.W.2d 89 (citation omitted). Nevertheless, while a defendant "need not prove the jury *would have* acquitted him, … he must prove there is a *reasonable probability* it would have, absent the error." *Id.*, ¶46 (formatting altered).

¶26 Whether an attorney rendered ineffective assistance is a mixed question of fact and law. *Id.*, ¶35. We will uphold the circuit court's findings of fact unless they are clearly erroneous, but "[t]he ultimate conclusion as to whether there was ineffective assistance of counsel is a question of law." *Id.* (alteration in original; citation omitted).

## I. Failure to conduct an adequate review of records related to the business dispute

¶27 Graf first asserts that Attorney Nelson was ineffective by failing to review certain records related to the business dispute between Alan and Graf. Specifically, Graf asserts that Attorney Nelson should have reviewed the transcript

of Graf's deposition in a civil lawsuit between Alan and Graf, during which Graf testified about Alan's alleged embezzlement of approximately $20,000 from the property management company in July 2016. Graf also asserts that Attorney Nelson should have reviewed an email that Graf sent to Attorney Rogosheske "providing a narrative account of a July 2015 incident where [Alan] threatened to report the sexual abuse allegations against [Graf] to police if [Graf] refused to allow [Hannah] to work at" the property management company.

¶28 We conclude Graf has failed to show that Attorney Nelson performed deficiently by failing to review the deposition transcript and email. As the State aptly notes, those two documents "are nothing more than Graf's own version of events. In other words, they are just the same story counsel would have learned by simply speaking to Graf." At the *Machner* hearing, Attorney Nelson testified that he met with Graf "on a pretty regular basis" prior to trial. Attorney Nelson also testified that he was aware of Graf's claims regarding Alan's embezzlement from the property management company and Alan's attempt to blackmail Graf. On appeal, Graf does not dispute that Attorney Nelson was aware of that information prior to trial, despite his failure to review the deposition transcript and email.

¶29 Accordingly, we agree with the State that "while [Attorney Nelson] may not have happened to learn this information from the two specific documents Graf references, he was nevertheless aware that this was Graf's version of events." Under these circumstances, Graf has failed to show that Attorney Nelson's failure to review the deposition transcript and email fell outside the wide range of professionally competent assistance. *See Strickland*, 466 U.S. at 690.

11

**II. Failure to present certain evidence regarding Alan's bias and motive to lie**

¶30     Graf next argues that Attorney Nelson was ineffective by failing to introduce three categories of evidence at trial related to Alan's alleged bias and motive to lie.

¶31     First, Graf argues that Attorney Nelson should have introduced evidence that Alan's alleged threats to take over the property management company predated the sexual assault and included threats to destroy Graf if he reported Alan's alleged embezzlement.   More specifically, Graf asserts that Attorney Nelson should have presented evidence that Alan had been "expressing a desire to take over the company" since March 2014; that Graf became aware that Alan was "embezzling large amounts of money" from the company in late 2014 or early 2015, and when he confronted Alan about the embezzlement, Alan threatened to destroy him and take the company; and that during a phone call, after Graf confronted Alan about using company money to pay for hockey tickets, Alan "asserted he would take [Graf's] company someday."   Graf argues, "Without any of this evidence, the jury was left with a false belief that the business disputes only arose after the alleged sexual abuse."

¶32     We conclude that Attorney Nelson did not perform deficiently by failing to introduce the above evidence.  This evidence consisted almost entirely of Graf's own statements about Alan's alleged conduct.  However, Graf elected not to testify at trial, and, in the absence of his testimony, his own hearsay statements about Alan's alleged conduct would not have been admissible.  *See* WIS. STAT. §§ 908.01(3), 908.02.  Thus, any attempt by Attorney Nelson to introduce Graf's hearsay statements about Alan's alleged conduct would have been properly rejected.  *See* ***State v. Wheat***, 2002 WI App 153, ¶23, 256 Wis. 2d 270, 647

12

N.W.2d 441 (explaining that trial counsel does not perform deficiently by failing to make a meritless argument). While Graf suggests that Judy could have testified as to what she overheard during the phone call about the hockey tickets, as discussed below, Attorney Nelson made a reasonable strategic decision not to call Judy to testify at trial. Graf also suggests that Attorney Nelson could have elicited evidence about Alan's alleged conduct during his cross-examination of Alan, but Graf presents no evidence to suggest that Alan would have admitted committing the alleged acts.

¶33 Second, Graf argues that Attorney Nelson should have introduced evidence that Alan attempted to blackmail Graf by threatening to report the sexual assault if Graf refused to allow Hannah to work at the property management company. Once again, however, in support of this allegation, Graf cites only his own hearsay statements about the alleged blackmail attempt, which would have been inadmissible at trial. Furthermore, we agree with the State that while Attorney Nelson "could perhaps have asked Alan whether he had tried to blackmail Graf, … Alan would have simply said no." Accordingly, Attorney Nelson did not perform deficiently by failing to introduce evidence regarding the alleged blackmail attempt.

¶34 Third, Graf asserts that Attorney Nelson should have introduced evidence that Graf left Alan a voicemail threatening to report Alan's alleged embezzlement to the police shortly before Alan reported the sexual assault. Graf contends that "the existence of that threatening voicemail dramatically increased [Alan's] motive to falsely accuse [Graf] of a crime."

¶35 We conclude Graf has failed to show that he was prejudiced by Attorney Nelson's failure to introduce evidence regarding the voicemail. The jury

was well aware of Graf's argument that Alan had coached Anne to fabricate the sexual assault allegations so that Alan could take over the property management company. While Graf asserts that evidence regarding the voicemail would have "dramatically increased" Alan's motive to falsely accuse Graf, as the State notes, there is no evidence that either Alan or Hannah actually heard the voicemail before they reported the assault to the police. Under these circumstances, we agree with the State and the circuit court that Graf has failed to show a reasonable probability that the outcome of his trial would have been different had Attorney Nelson introduced evidence regarding the voicemail.

## III. Discussing facts in the defense's opening statement but presenting no evidence to support them

¶36 Next, Graf asserts that Attorney Nelson was ineffective by "[a]rguing important facts in opening statements and presenting no evidence in support." (Formatting altered.) Specifically, Graf argues that the "story of innocence" that Attorney Nelson presented in his opening statement included "three key supporting facts: (a) [Graf] arrived at the [Star Prairie] property late in the afternoon; (b) upon arrival, [Graf] built airplane stands with [Anne] by the garage; and (c) [Graf] never went into the camper with [Anne] that day." Graf asserts that at the time Attorney Nelson made his opening statement, he intended to present evidence regarding these facts through Judy's testimony. However, Attorney Nelson subsequently decided not to call Judy to testify.

¶37 In support of his argument that Attorney Nelson performed deficiently by "promising" that the jury would hear evidence regarding the facts discussed above, Graf cites *State v. Coleman*, 2015 WI App 38, 362 Wis. 2d 447, 865 N.W.2d 190. In *Coleman*, the defendant's trial attorney knew that the defendant did not want to testify at trial. *Id.*, ¶28. Nevertheless, in his opening

14

statement, counsel told the jury that the defendant "will testify because he has to testify here from my point of view. It's my call to make as a defense attorney." *Id.*, ¶29. On appeal, we concluded that counsel performed deficiently in this respect, explaining, "If counsel says something will happen that does not, without explanation, counsel necessarily damages both his own, and potentially his client's, credibility. Such a cavalier regard for being truthful with the jury is not how 'an ordinarily prudent lawyer' in Wisconsin would represent a client." *Id.*, ¶30 (citation omitted).

¶38 Graf also cites *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 257-59 (7th Cir. 2003), where the court held that trial counsel performed deficiently when he promised the jury during his opening statement that the defendant would testify and that the evidence would show that the defendant was not a gang member, but counsel then failed to "deliver on either promise." The court reasoned, "[W]hen the failure to present the promised testimony cannot be chalked up to unforeseeable events, the attorney's broken promise may be unreasonable, for 'little is more damaging than to fail to produce important evidence that had been promised in an opening.'" *Id.* at 257 (citation omitted).

¶39 Both *Coleman* and *Hampton* are materially distinguishable from this case because, here, Attorney Nelson did not promise or state unequivocally that the jury would hear the evidence in question. Instead, beginning during voir dire, Attorney Nelson emphasized that the jury "might just hear one side" of the story. Later, during his opening statement, Attorney Nelson explained that the jury was "going to hear from" Alan and Hannah and was "going to watch" Anne's forensic interview. In contrast to those definitive statements, however, Attorney Nelson also stated, "Other names that are going to come up, *you might hear from them*, would be" Alan's grandmother, Ethel, and Judy. (Emphasis added.) Only

then did Attorney Nelson summarize what he believed the testimony of these witnesses would show. Attorney Nelson did not, however, promise that the jury would hear this evidence. We agree with the State that, "[w]hile it is true that in hindsight [Attorney Nelson] was not successful in proving" every fact mentioned in his opening statement, his "reasonable and qualified predictions of what the evidence might show do not constitute deficient performance."

## IV. Failure to call Judy to testify

¶40    Graf also argues that Attorney Nelson was ineffective by failing to call Judy to testify at trial. He contends that Judy would have provided exculpatory testimony, including the following: (1) on the day of the assault, Graf was mowing the lawn at a property in Minnesota and did not arrive at the Star Prairie residence until late in the afternoon, such that Graf and Anne were only together at the Star Prairie home for about one hour; (2) Graf and Anne were not building shelves but were instead building stands for remote-controlled airplanes in front of the garage; (3) Graf and Anne were never in the camper together on the day of the assault; (4) Judy was cleaning out the camper that afternoon and left it only briefly to make trips to the house; and (5) Graf paid Anne for helping him build the airplane stands, and the idea to keep the money secret was Anne's, not Graf's.

¶41    In addition, Graf asserts that Judy would have testified regarding Alan's alleged embezzlement from the property management company; Alan's threats to take the company away from Graf; and the fact that, on the day Alan and Hannah were fired, Hannah yelled, "You can't run the company from prison, [Graf]," and Alan yelled, "I will have the company when you are in prison!" Graf

contends that Judy also would have disputed Alan's and Hannah's testimony that they kept Anne away from Graf following the assault.

¶42     Based on Attorney Nelson's testimony at the *Machner* hearing, the circuit court determined that Attorney Nelson made a reasonable strategic decision not to call Judy to testify at trial. We agree.

¶43     At the *Machner* hearing, Attorney Nelson explained that at the time he made his opening statement, he intended to call Judy to testify. He subsequently decided not to call Judy, however, because he "was worried that she was going to be impeached." In particular, Attorney Nelson cited the fact that, when Judy initially spoke to law enforcement in 2016, she reported that Graf had told her about a conversation in which he gave Anne a dollar for helping him, and Anne said the dollar was a secret. Judy's story later changed, however, and in a 2017 affidavit, she claimed that she was present for and personally heard that conversation. Judy similarly asserted during a pretrial meeting with Attorney Nelson that she had personally heard that conversation. During Graf's trial, Attorney Nelson became aware that the State knew about this inconsistency, and his concern that the State would impeach Judy using her 2016 interview was the primary reason for his decision not to call Judy to testify.

¶44     In addition to the above inconsistency as to whether Judy heard the alleged conversation between Anne and Graf, there were other problems with Judy's proffered testimony. For instance, Judy originally told investigators that on the day of the assault, she was "in and out of the house" with Anne's baby brother. At the *Machner* hearing, however, Judy testified that she was in the camper "pretty much" all day and was not helping to care for Anne's baby brother. Additionally, Judy testified at the *Machner* hearing that between the alleged

17

assault in May 2015 and the date when Alan and Hannah were fired in September 2016, Graf had contact with Anne "at least a dozen" times. But this testimony contradicted Graf's own statement to law enforcement in September 2016 that he had "probably only seen [Anne] three times in [his] life." Furthermore, while Judy denied at the **Machner** hearing that there was a lawnmower at the Star Prairie house on the day of the assault, Graf admitted to law enforcement that he had unloaded a lawnmower in the garage at the Star Prairie property that day.

¶45   Given these inconsistencies between Judy's proffered testimony and other evidence in the case, we cannot say that Attorney Nelson's strategic decision not to call Judy to testify was objectively unreasonable. *See Mull*, 406 Wis. 2d 491, ¶35. Attorney Nelson's decision not to call Judy was not "based on an irrational trial tactic or based upon caprice rather than upon judgment." *See id.* (citation omitted). Accordingly, we agree with the circuit court that Attorney Nelson did not perform deficiently in this respect.

## V. Failure to call other witnesses

¶46   Graf next argues that Attorney Nelson was ineffective by failing to call three other witnesses to testify at trial. First, he contends that Attorney Nelson should have called the Grafs' neighbor, Robert Tauber, who would have testified that he mowed the lawn at the Star Prairie residence for the entire summer of 2015 and that the Grafs did not have a lawnmower at the Star Prairie property. We agree with the circuit court, however, that Attorney Nelson did not perform deficiently by failing to call Tauber because there is no evidence that either Graf or Judy told Attorney Nelson about Tauber's existence or his potential testimony prior to trial. As the court correctly noted, "Attorney Nelson cannot be held

deficient for not investigating and/or calling a witness if he is not given that information." *See State v. Hubanks*, 173 Wis. 2d 1, 26-27, 496 N.W.2d 96 (Ct. App. 1992) (concluding that trial counsel did not perform deficiently by failing to investigate and call potential witnesses when the defendant did not inform counsel of the existence of those witnesses).

¶47 On appeal, Graf claims that "[b]asic questioning of Judy would have revealed that [the Grafs] didn't have a mower at the Star Prairie property, and that Tauber mowed that property for them." At the *Machner* hearing, however, Attorney Nelson testified that he spoke with Judy "numerous times about … what she knew about the case, or what was going on with the case or lots of different things." Attorney Nelson also testified that he spoke with both Graf and Judy "on a pretty regular basis" during the weeks leading up to Graf's trial. Graf does not dispute that, despite these frequent conversations, neither he nor Judy ever told Attorney Nelson about Tauber or his potential testimony. Under these circumstances, we reject Graf's argument that Attorney Nelson's "failure to investigate this issue and learn this information was deficient."

¶48 Second, Graf contends that Attorney Nelson should have called two employees of the property management company, who would have testified that on the day Alan and Hannah were fired, Hannah "was screaming at [Graf], calling him a child molester" and saying that she and Alan "will own the company and it will be taken away from [Graf]." Graf contends that Attorney Nelson should have known that this issue would be contested at trial, given that Alan "denied any such statements in his civil deposition."

¶49 We conclude Graf has failed to show that he was prejudiced by Attorney Nelson's failure to call these witnesses. At trial, both Alan and Hannah

19

testified that on the day they were fired, Hannah was yelling and screaming at Graf, and the police were called. While Alan denied that he told Graf, "You can't run the company from prison," he did not deny that Hannah made such a statement. Additionally, Hannah did not deny making that statement; she simply testified that she could not remember whether she did so. While the employees' proffered testimony included an additional detail about Hannah telling Graf that she and Alan "will own the company and it will be taken away from [Graf]," we cannot conclude it is reasonably probable that the result of Graf's four-day jury trial would have been different had the jury heard that additional detail. As such, Graf has failed to demonstrate prejudice with respect to this alleged error.

## VI. Failure to seek admission of Ethel's prior statements under WIS. STAT. § 908.06

¶50    As noted above, at trial, both Alan and Hannah testified that Alan's grandmother, Ethel, told Alan not to report the assault to the police. Thereafter, during Lieutenant Hart's trial testimony, Attorney Nelson sought to admit Ethel's prior statements to Hart that Ethel did, in fact, tell Alan to report the assault. However, the State objected on hearsay grounds, and the circuit court sustained that objection. On appeal, Graf argues that Attorney Nelson was ineffective by failing to "cite a provision that clearly would have supported admissibility" of Ethel's statements—namely, WIS. STAT. § 908.06.

¶51    Like the circuit court, we conclude that Attorney Nelson did not perform deficiently in this regard because Ethel's statements to Lieutenant Hart were not admissible under WIS. STAT. § 908.06. That statute provides, in relevant part, that "[w]hen a hearsay statement has been admitted in evidence, the credibility *of the declarant* may be attacked, and if attacked may be supported by

any evidence which would be admissible for those purposes if declarant had testified as a witness." *Id.* (emphasis added).

¶52    Here, the hearsay statement that was admitted into evidence was Ethel's statement to Alan—as testified to by both Alan and Hannah—that Alan should not report the assault to the police. The "declarant" with respect to that statement was Ethel. *See* WIS. STAT. § 908.01(2) ("A 'declarant' is a person who makes a statement."). However, Graf was not seeking to introduce Ethel's prior statements to Lieutenant Hart to attack *Ethel's* credibility. Instead, he was trying to introduce those statements to attack Alan's and Hannah's credibility by showing that they were lying about Ethel telling Alan not to report the assault. Although Graf argues that he was actually attempting to attack the credibility of "the falsified version of Ethel that [Alan and Hannah] invoked to support their decision not to go to police," we agree with the State that "this is just another way of saying that he was trying to show [that] Alan and Hannah were lying, i.e., attack Alan's and Hannah's credibility."

¶53    Under these circumstances, WIS. STAT. § 908.06 is plainly inapplicable. As such, Attorney Nelson did not perform deficiently by failing to seek admission of Ethel's statements under that statute. *See Wheat*, 256 Wis. 2d 270, ¶23.

## VII.  Cumulative prejudice

¶54    When a defendant claims that his or her trial attorney was ineffective in multiple respects, "prejudice should be assessed based on the cumulative effect of counsel's deficiencies." *State v. Thiel*, 2003 WI 111, ¶59, 264 Wis. 2d 571, 665 N.W.2d 305. "Just as a single mistake in an attorney's otherwise commendable representation may be so serious as to impugn the integrity of a

proceeding, the cumulative effect of several deficient acts or omissions may, in certain instances, also undermine a reviewing court's confidence in the outcome of a proceeding." *Id.*, ¶60. However, "each alleged error must be deficient in law—that is, each act or omission must fall below an objective standard of reasonableness—in order to be included in the calculus for prejudice." *Id.*, ¶61.

¶55 We have rejected Graf's claims that Attorney Nelson performed deficiently by failing to review Graf's deposition transcript and email to Attorney Rogosheske prior to trial, by failing to present certain evidence regarding Alan's bias and motive to lie, by discussing facts in his opening statement but presenting no evidence to support them, by failing to call Judy and Tauber to testify, and by failing to seek admission of Ethel's prior statements under WIS. STAT. § 908.06. As such, we do not consider those alleged errors in our cumulative prejudice analysis. Instead, we consider only whether Graf was prejudiced by the cumulative effect of: (1) Attorney Nelson's failure to introduce evidence of the threatening voicemail that Graf left Alan shortly before Alan reported the sexual assault; and (2) Attorney Nelson's failure to call the two employees of the property management company to testify.

¶56 We have already concluded that neither of these alleged errors, individually, prejudiced Graf's defense. Graf has failed to show that he was prejudiced by Attorney Nelson's failure to introduce the voicemail, as Graf cites no evidence that either Hannah or Alan heard the voicemail before Alan reported the assault. Furthermore, it is not reasonably probable that the result of Graf's trial would have been different had Attorney Nelson called the employees of the property management company as witnesses, given that their testimony would have largely duplicated Alan's and Hannah's testimony about Hannah yelling at Graf on the day she and Alan were fired.

¶57    Combining the negligible prejudicial effect of these two alleged errors does not undermine our confidence in the outcome of Graf's trial. Accordingly, Graf has failed to show that he was prejudiced by the cumulative effect of these alleged errors.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published.    *See* WIS. STAT. RULE 809.23(1)(b)5.